Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

*Counsel for Defendant Joel Michael Ryno*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOEL MICHAEL RYNO,<br><br>Defendant. | Case No. 3:22-cr-00045-JMK-MMS<br><br>**MOTION TO DISMISS BASED ON NEW YORK RIFLE & PISTOL ASS'N V. BRUEN** |

A period of excludable delay under 18 U.S.C. § 3161(h) will occur as a result of the filing this motion and should be excluded from the computation of the 70-day time limit for trial under 18 U.S.C. §§ 3161(h)(1)(D). The Speedy Trial Act calculation, as of the date of the filing of this motion, shows that 65 days remain for Speedy Trial purposes in light of past waivers by Defendant and findings previously made by the Court relative to this matter.

## Table of Contents

I.  BACKGROUND ..................................................................................................................... 3

II.  ARGUMENT ......................................................................................................................... 5

    A.  The historical inquiry required under Bruen and Heller. ............................................... 5

        *1.*  *Bruen* overhauled the test for determining whether Government action infringes on the right to keep and bear arms. .......................................................................................... *5*

        *2.*  Under *Bruen,* when a regulation seeks to address a general societal problem that has persisted since the 18th Century, the Government must identify a "distinctly similar" historical regulation. ............................. *8*

    B.  Persons convicted of domestic violence offenses are among the "people" who have a Second Amendment right to keep and bear arms, which is not limited to "law-abiding, responsible citizens"...................................... 10

        *1.*  *Bruen* abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment. *11*

        *2.*  The Second Amendment right to keep and bear arms is not limited to "law-abiding, responsible citizens." *14*

*3.* Mr. Ryno's conduct is protected by the Second Amendment. ...................................................... *17*

C. Persons convicted of misdemeanor domestic violence offenses have standing to assert violations of the Second Amendment, and the Government's contrary argument has been rejected in this circuit. .........................18

D. There is no American historical tradition prohibiting possession of firearms by persons with misdemeanor domestic violence convictions. .........................................................................................................20

*1.* Laws such as 18 U.S.C. § 922(g)(9) which prohibit possession of firearms based on an individual's criminal history are a 20th Century invention. ..............................................................................*20*

*2.* Restricting the right to bear arms based on prior criminal history does not comport with colonial and Founding-era history. ...................................................................................................................*23*

*3.* There is no historical tradition of disarming "unvirtuous" citizens. ...............................................*26*

4. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to early American laws that disarmed "dangerous" groups of people such as slaves, freed Blacks, and Native Americans......*28*

5. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to laws that prohibited possession of firearms by traitors and those who were suspected of disloyalty to the Nation.....*30*

*6.* The Government cannot establish an historical tradition of permanently disarming persons accused of violence. .................................................................................................................................*32*

**III. CONCLUSION**.................................................................................................................................**33**

Defendant Joel Michael Ryno, by and through the Federal Defenders hereby moves this Court for an order dismissing Counts 1-3, Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g)(9) pursuant to the Second Amendment of the United States Constitution as construed by the Supreme Court in *New York Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111 (2022).

Mr. Ryno is alleged to have possessed on various occasions, four firearms[1] possessed to defend himself and his property. This conduct is presumptively protected by the Second Amendment. *Id.* at 2129-30. The government therefore bears the burden of establishing that 18 U.S.C. § 922(g)(9) is consistent with this nation's historical tradition of firearm regulation. *Id.* Applying *Bruen*'s historical framework, there are no regulations that are "distinctly similar" to 18 U.S.C. § 922(g)(9), which prohibits possession of firearms by persons convicted of misdemeanor domestic violence offenses. *Id.* at 2131. Further, disarmament laws like § 922(g)(9) are a 20th Century invention, and do not share any commonalities with those firearm regulations that were widespread and commonly accepted in the founding era when the Second Amendment was adopted. Accordingly, Mr. Ryno can establish that application of § 922(g)(9) is unconstitutional as applied to his conduct and that Counts 1-3 must be dismissed.

## I.    BACKGROUND

On May 17, 2022, Mr. Ryno was charged in an indictment (Dk. 4) filed in the U.S.

---

[1] Two counts also contain an allegation of possession of ammunition associated with the alleged firearm possession as well.

District Court of Alaska charging him with three counts of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(9) and § 924(a)(2). The indictment states that on or about December 16, 2020, Mr. Ryno possessed a Remington, Model: 597 .22 with 10 rounds of ammunition; on or about February 24, 2022, Mr. Ryno possessed a Glock, Model 17, 9mm and 9mm ammunition; and on or about April 16, 2022, Mr. Ryno possessed a Glock, Model: 48 9mm, and a New Frontier Armory, Model: C-9 multicaliber pistol.

The indictment alleges that Mr. Ryno was prohibited from possessing firearms under federal law because he had been convicted of at least one prior misdemeanor offense of domestic violence, to wit: two Assault in the Fourth Degree convictions imposed by the District Court of the State of Alaska, Case Nos. 3PA-17-01151CR, and 3PA-19-02536CR.

According to information provided to the defense, on December 16, 2020, Mr. Ryno was contacted by Sgt. Kirksey during a traffic stop and found to be in possession of a .22 caliber rifle in violation of his conditions of release for 3PA-19-02536CR. On February 24, 2022, Alaska State Troopers (AST) responded to a call for service and contacted Mr. Ryno who had an active seizure warrant. Upon making contact with officers, Mr. Ryno advised police he possessed a Glock, Model 17, 9 mm in a concealed shoulder holster. On February 28, 2022, Mr. Ryno was interviewed at the Palmer AST post and was advised by SA Foreman that the long-term domestic violence protective order active against him prohibited him from possessing firearms. On April 16, 2022, in response to a welfare check, Mr. Ryno was contacted by AST officers who located and seized a Glock, Model 48, 9mm, and a New Frontier Armory pistol from him.

## II. ARGUMENT

Mr. Ryno faces federal prosecution for possessing firearms used to defend his person, home and property. The government alleges that Mr. Ryno is prohibited from possessing firearms because he has at least one prior *misdemeanor* conviction for domestic violence, making him subject to criminal prosecution under 18 U.S.C. § 922(g)(9).

This provision is unconstitutional as applied to Mr. Ryno, as his conduct is protected by the Second Amendment. Because the Government cannot carry its burden of demonstrating that Section 922(g)(9)'s application to Mr. Ryno's conduct is consistent with this nation's historical tradition of firearm regulation at the founding, the indictment must be dismissed.

### A. The historical inquiry required under Bruen and Heller.

#### 1. *Bruen* overhauled the test for determining whether Government action infringes on the right to keep and bear arms.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008).

The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the

Second Amendment was interpreted in the century after its enactment. *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Following *Heller*, federal courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *See, United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases).

Under this two-step test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (quotations omitted). This step was satisfied if the law "burden[ed] conduct that was within the scope of the Second Amendment as historically understood." *Id.*

If the law burdened conduct covered by the Second Amendment, courts then "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.* The level of scrutiny applied depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 1138 (quotations omitted). This could vary between intermediate and strict scrutiny but required more than rational basis. *See Id.* at 1137 (citing *Heller*, 554 U.S. at 628 n.27). This meant, at minimum, courts always assigned some weight to the government's interest in public safety and "keeping

firearms away from those most likely to misuse them." *Id.* at 1139 (quotations omitted).

Recently, the Supreme Court in *Bruen* squarely rejected that approach, instructing courts, instead, to consider only "constitutional text and history." *Bruen,* 142 S. Ct. at 2128-29. In *Bruen*, the Court considered the constitutionality of New York's "proper cause" licensing scheme for possession of concealed weapons outside the home. *Id.* at 2123. Under the law's "demanding" standard, state officials had broad discretion to withhold a license unless the applicant could establish a "special need for self-protection distinguishable from that of the general community," such as "particular threats, attacks or other extraordinary danger to personal safety." *Id.*

The Court in *Bruen* began by affirming the first step of the analysis: that courts examine "a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification." *Id.* at 2127–28 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id.* at 2128–29. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id.* at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2130, 2126. This inquiry requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138.

But the *Bruen* Court then declined to conduct the second step, stating that *Heller* did not support "applying means-end scrutiny in the Second Amendment context." *Id.* at

2127. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id.* at 2131 (quotations and emphasis omitted). So even if a firearm restriction could satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id.* at 2129 (quotations omitted). Thus, the "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id.* at 2129.

Instead of ratifying the second step of the analysis, the *Bruen* Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* But the Court reminded that "not all history is created equal." *Id.* at 2131–32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quotations and emphasis omitted).

> **2. Under *Bruen*, when a regulation seeks to address a general societal problem that has persisted since the 18th Century, the Government must identify a "distinctly similar" historical regulation.**

*Bruen* drew a distinction between two types of regulations. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Id.* at 2131. Courts should begin by deciding whether "a distinctly similar historical regulation address[ed] the

problem." *Id.* If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id.* Likewise, if earlier generations rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical regulations and the challenged regulation are "relevantly similar," with special attention to "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

In either case, the burden falls on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the government cannot do so, the infringement cannot survive.

Employing these tools, *Bruen* concluded that New York's law fell under the first category. It implicated a societal problem dating back to the founding: "handgun violence, primarily in urban areas." *Id.* at 2131. Thus, there was no need for analogical reasoning and the government bore the burden to show a "comparable tradition of regulation" from the founding era. *Id.* The government, however, had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. At most, the government had shown restrictions on some "dangerous and unusual

weapons" and "bearing arms to terrorize the people." *Id.* at 2143. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id.* at 2145, 2154.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following: If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

**B. Persons convicted of domestic violence offenses are among the "people" who have a Second Amendment right to keep and bear arms, which is not limited to "law-abiding, responsible citizens".**

Mr. Ryno expects the Government will attempt to sidestep the straightforward *Bruen* analysis above by falling back on two passages from *Heller* that supposedly place persons with criminal convictions outside the protection of the Second Amendment. In the Government's likely view, these passages deem felon-disarmament laws and other status-based disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens."

Neither passage supplants nor justifies ignoring *Bruen*'s clear command. The first has been superseded by the new *Bruen* framework; the second establishes a

constitutional baseline that protects, rather than limits, Second Amendment rights. These passages cannot save § 922(g)(9).

### 1. *Bruen* abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment.

*Heller* upheld an individual right to keep and bear arms under the Second Amendment but cautioned that this right is "not unlimited." 554 U.S. at 626. As an example, the Court explained that nothing in its decision called into question a non-exhaustive list of "presumptively lawful regulatory measures"—i.e., ones that had *not* yet undergone a full historical analysis. *Id.* at 627 n.26.

This list included supposedly "longstanding" prohibitions on possession of firearms by felons and the mentally ill, and the carrying of firearms in "sensitive places." *Id.* at 626. In a post-*Heller* decision considering the constitutionality of 18 U.S.C. § 922(g)(1), the Ninth Circuit rejected the defendant's argument that *Heller*'s list of "presumptively valid" exceptions was "not binding," and instead deferred to prior precedent upholding "the very type of gun possession restriction that [*Heller*] deemed 'presumptively lawful.'" *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (confirming that *Vongxay* was "[b]ased on this language" from *Heller*).

Citing *Vongxay*, the Government is expected to rely heavily on *Heller's* list of "presumptively valid" regulatory measures to broadly assert that any law regulating possession of firearms by felons or persons convicted of misdemeanor criminal offenses is immune from Second Amendment challenge. But *Vongxay*'s reading of *Heller* is

incompatible with *Bruen,* which has repudiated any reliance on *Heller*'s list of "presumptively lawful" exceptions to uphold felon disarmament statutes and derivative laws like 18 U.S.C. § 922(g)(9).

"[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (*en banc*).

To determine whether a prior opinion was overruled, courts look not only to "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989)). Such holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.*

*Vongxay* relied on a line of cases upholding felon disarmament laws under means-end scrutiny. *Id.* at 1116–18. *Bruen* has abolished any reliance on means-end scrutiny, and is therefore incompatible with this reading of *Heller*. *Vongxay* is therefore no longer good law. *See Miller*, 335 F.3d at 900.

*Bruen* is also clearly irreconcilable with prior precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls absent a full historical analysis. Among the examples of regulations characterized by *Heller* as presumptively valid, the Court included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment

or state analogues." *Id.* Elsewhere, *Heller* noted multiple state Supreme Court decisions which held that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id.* at 613, 629.

But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* And since *Heller* was the Court's "first in-depth examination of the Second Amendment," it could not "clarify the entire field." *Id.* at 635. But *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.; see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("<u>Heller</u> described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

*Bruen,* however, did undertake an "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms. While acknowledging *Heller*'s preliminary analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See id.* at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket prohibition on concealed carry or even limit it to those with special self-defense needs. *Id.* at 2156.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an "exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 554

U.S. at 635. *Bruen*'s mode of analysis thus shows that *Heller*'s preliminary list of Second Amendment exceptions are not binding, nor does it prevent courts from conducting a full historical review which leads to a different conclusion. So as with the New York statute, the application of *Bruen*'s more exacting and in-depth test—rather than *Heller*'s preliminary take—controls.

Even before *Bruen*, numerous Ninth Circuit judges had noted that there were "good reasons to be skeptical" that any "longstanding prohibition" prevented felons from having guns. *Phillips*, 827 F.3d at 1174; *see also, id.* at n.2 (discussing sources that found "little to no historical justification for the practice"). Some judges have also doubted *Vongxay*'s holding that *Heller*'s language "categorically barred" challenges to felon-in-possession laws. *United States v. Torres*, 789 F. App'x 655, 657 (9th Cir. 2020) (Lee, J., concurring). *See also Pena v. Lindley*, 898 F.3d 969, 1006 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (stating that Heller's "presumptively lawful" language "must be a presumption that is subject to rebuttal"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 692 (9th Cir. 2017) (en banc) (Tallman, J., concurring in part and dissenting in part) (reading *Heller*'s list of "presumptively lawful" exceptions as being "subject to rebuttal").

The Supreme Court in *Bruen* has now unequivocally confirmed what these judges suspected: like the New York concealed-carry laws that *Bruen* held unconstitutional, a full historical analysis of a prohibition conducted under the standard set out in *Bruen* can rebut *Heller*'s "presumptively lawful" exceptions to the Second Amendment.

**2. The Second Amendment right to keep and bear arms is not limited to "law-abiding, responsible citizens."**

In *Heller*, the Court remarked that the Second Amendment was the product of an interest balancing by the Framers. In rejecting the interest-balancing inquiry proposed by the dissenting Justices, the *Heller* majority explained that courts lack authority to "decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634 (emphasis in original). And regardless, the Court wrote, "*whatever else* [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). Based on this language, the Government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms. But nothing in the plain text of the Second Amendment draws a distinction between persons convicted of crimes and "the people," and the Government's contrary argument misreads *Heller*'s holding.

As construed by *Heller*, the Second Amendment codifies the preexisting right of "the people" to keep and bear arms. The phrase "the people" is a "term of art" that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580–81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Further, the Court held, "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Because persons like Mr. Ryno are not categorically excluded from our national community, they fall within the Second Amendment's scope.

This reading complies with the way "the people" are defined for purposes of other

constitutional rights. Both *Heller* and *Bruen* linked "the people" in the Second Amendment with "the people" in the First Amendment, the Fourth Amendment, the Ninth and Tenth Amendments.[2] It is highly unusual to interpret these constitutional rights as inherently inapplicable to certain classes of people. For example, we do not assume that convicted felons are excluded from the First Amendment's protections by virtue of their status as convicted felons. *See, e.g., Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). Nor does the Fourth Amendment make an exception for felons, who are among "the people" whose "persons, houses, paper and effects" enjoy Fourth Amendment protection. *See, e.g., United States v. Lara*, 815 F.3d 605 (9th Cir. 2016).

*Heller* did not purport to limit the Second Amendment's reach to law-abiding, responsible citizens. Rather, it held that, *at the very least*, such people are protected by the Second Amendment. The passage quoted above makes it clear that the Court's reference to "law-abiding, responsible citizens" was meant to establish a floor, not a ceiling. The Court did not have occasion to address whether criminal history is relevant when construing the full scope of the protected right.[3]

---

[2] *Heller* noted the similarities between the Second Amendment and the First and Fourth Amendments, implying that the phrase "the people" (which occurs in all three) has the same meaning in all three provisions. *See Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 580 (noting that "the people" is "a term of art employed in select parts of the Constitution," including the First, Second, Fourth, Ninth, and Tenth Amendments) (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

[3] *Heller* also used the word "law-abiding" when discussing *United States v. Miller*, 307 U.S. 174 (1939). The *Heller* Court stated that it would "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This citation to *Miller* was clearly in reference to the types of weapons (i.e., "arms") that are eligible for Second Amendment protection, rather than the "people" whose conduct is protected. *Id.* at 622 (explaining *Miller* did not turn on whether "the Second Amendment

If there was any ambiguity, *Bruen* clarifies that this passage does not delineate the scope of the Second Amendment. Although *Heller* reasoned that the Second Amendment protected the right of law-abiding persons to use arms in defense of "hearth and home," *Bruen* held that the Second Amendment's protections *do* extend outside the home. And the insistence throughout *Bruen* that the government bears the burden of proving any regulation as consistent with this Nation's historical traditions commands that the government prove its case not by dicta but by actual evidence. And as explained below, the historical record provides no support whatsoever for laws disarming persons convicted of *misdemeanor* domestic violence offenses.

This Court should decline to read into *Bruen* and *Heller* a qualification that the Second Amendment belongs only to individuals who have not been previously convicted of violating the law. Mr. Ryno rightfully claims a protected Second Amendment right, and 18 U.S.C. § 922(g)(9) cannot survive scrutiny under *Bruen*.

### 3. Mr. Ryno's conduct is protected by the Second Amendment.

This Court should decline to read into *Bruen* an unwritten qualification that Second Amendment rights belong only to individuals who have not been accused of violating any laws. As noted above, under *Bruen*, because Mr. Ryno's conduct is presumptively protected by the Second Amendment, the government bears the corresponding burden of establishing a tradition of "distinctly similar" historical firearm regulation. 142 S. Ct. at

protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case). *Heller*'s use of the term "law-abiding," therefore, provides no support for the view that any group of people are unentitled to the Second Amendment's protection.

2131. The government will be unable to produce evidence that demonstrates a historical tradition of firearm regulation "distinctly similar" to Section 922(g)(9), and cannot carry its burden under *Bruen*. Accordingly, the statute is unconstitutional as applied to Mr. Ryno.

### C. Persons convicted of misdemeanor domestic violence offenses have standing to assert violations of the Second Amendment, and the Government's contrary argument has been rejected in this circuit.

The Government is likely to make a class-based interpretation of the Second Amendment, but such argument has been squarely rejected by the Ninth Circuit once already. In *United States v. Chovan*, the Government argued that Section 922(g)(9) was part of a "long line of prohibitions and restrictions on the right to possess firearms by persons perceived as dangerous or violent." 735 F.3d at 1137 (9th Cir. 2013). For this reason, the Government will likely argue, the law does not burden "rights historically understood to be protected by the Second Amendment." *Id.* However, the Ninth Circuit has had little difficulty rejecting this contention:

> We do not agree. First, it is not clear that such prohibitions are so longstanding. The first federal firearm restrictions regarding violent offenders were not passed until 1938, as part of the Federal Firearms Act. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698, 708 (2009) (noting that "one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I"). Second, and more importantly, the government has not proved that domestic violence misdemeanants in particular have historically been restricted from bearing arms. The Federal Firearms Act of 1938 only restricted firearm possession for those individuals convicted of a "crime of violence," defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking, and certain forms of aggravated assault— assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any

offense punishable by imprisonment for more than one year." *Id.* at 699 (internal quotation marks omitted). Domestic violence misdemeanants—like Chovan, who was convicted of simple misdemeanor assault under California Penal Code § 273.5(a)—would not be restricted from possessing firearms under the Federal Firearms Act. In fact, domestic violence misdemeanants were not restricted from possessing firearms until 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968. Pub.L. No. 104–208, § 658, 110 Stat. 3009, 3009–371 (1996).

Because of "the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that [Chovan]'s Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense." *United States v. Cheste*r, 628 F.3d 673, 681–82 (4th Cir. 2010).

*United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013).

After finding that Section 922(g)(9) burdened protected conduct, the Ninth Circuit went on to apply the second step of the two-step inquiry adopted by circuit courts in the wake of *Heller,* which asked whether the law survived means-end scrutiny. *Id.* at 1136-1139. *Bruen* abolished this second step of the analysis, and to the extent that *Chovan* relied on means-end scrutiny to uphold the constitutionality of Section 922(g)(9), it is no longer binding precedent. Nonetheless, *Chovan* correctly considered the plain text and history of the Second Amendment to find that persons convicted of misdemeanor domestic violence offenses are indeed among "the People" to whom the Second Amendment's plain text refers.

In both *Heller* and *Bruen*, the Court held that Second Amendment scrutiny is triggered so long as the litigant can establish that their *conduct* is encompassed by the

Second Amendment's text. *Bruen*, 142 S. Ct. at 2129-30, *Heller*, 554 U.S. at 592

Here, Mr. Ryno's conduct – his possession of firearms and ammunition in defense of his life and property – is plainly covered by the scope of the Second Amendment as it was understood when the Bill of Rights was ratified. The Supreme Court has explicitly held that the Second Amendment confers an "individual right to possess and carry weapons." *District of Columbia v. Heller,* 554 U.S. 570, 592 (2008). The core of this guarantee is the right to keep and bear arms for defense of self, family and home, as well as hunting. *Heller*, 128 S. Ct. 2801 ("Americans valued the ancient right . . . for self-defense and hunting."). Thus, Mr. Ryno's charged conduct is covered by the Second Amendment's plain text.

### D. There is no American historical tradition prohibiting possession of firearms by persons with misdemeanor domestic violence convictions.

As in *Bruen,* the "general societal problem" that § 922(g)(9) is intended to address – access to firearms by perpetrators of domestic violence – is one that has persisted since the 18th Century. The law is therefore unconstitutional unless the Government can establish a robust tradition of "distinctly similar historical regulation." However, the Government cannot carry its burden here, as there are <u>no</u> examples of laws permanently disarming citizens based on criminal history prior to the 20th Century. *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

### 1. Laws such as 18 U.S.C. § 922(g)(9) which prohibit possession of firearms based on an individual's criminal history are a 20th Century invention.

The origin of 18 U.S.C. 922(g)(9) can be traced to the 1938 National Firearms Act, which prohibited possession of firearms by persons convicted of certain felonies such as

murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until **1961** that Congress amended the statute to prohibit "possession by all felons." *United States v. Skoien,* 614 F.3d 638, 640 (7th Cir. 2010) (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* It wasn't until 1996, <u>less than 30 years ago</u>, that Congress extended the prohibition to include persons convicted of "a misdemeanor crime of domestic violence" by enacting 18 U.S.C. § 922(g)(9) as a supplement to the 1968 Gun Control Act. Thus, § 922(g)(9) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—created over two centuries after adoption of the Second Amendment.

Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. *Bruen* was especially hostile to 20th Century historical evidence because such evidence does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence. *Id.* at 2154 n. 28.

Prior to *Bruen*, Circuit courts asked to consider whether § 922(g)(9) complied with the Second Amendment agreed that its prohibitions were not rooted in this nation's history of firearm regulations, insofar as its provisions were enacted in 1996. See, *United States v. Hayes,* 555 U.S. 415 (2009) (discussing its genesis). Indeed, numerous Circuit courts have held that there is inconclusive evidence that felons – much less *misdemeanants* – were barred from possessing firearms at the time of the founding. *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("The academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is "inconclusive at best."

(citation omitted))

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(9) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012).

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009).

It appears New York became the first state to enact such a ban, when in 1917 it made

a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; see also Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); accord N.R.A., 700 F.3d at 197 ("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult to make.").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. There is not even a colorable suggestion that there was a "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(9). Clearly, the "Founders themselves could have adopted" laws like § 922(g)(9) to "confront" the "perceived societal problem" posed by perpetrators of domestic violence. *Id.* at 2131. They completely declined to do so, and that inaction indicates § 922(g)(9) "[i]s unconstitutional." *Id.*

### 2. Restricting the right to bear arms based on prior criminal history does not comport with colonial and Founding-era history.

Academics and jurists agree that if one seeks even debatable "authority before

World War I for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution." *Kanter v. Barr,* 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J. dissenting) (quoting Marshall, *supra*, at 712). Three states—Pennsylvania, Massachusetts, and New Hampshire—proposed versions of the Second Amendment that seemed to carve out an exception for regulating gun possession by certain people.

For example, antifederalists from Pennsylvania proposed wording of the Second Amendment which specified that "no law shall be passed for disarming the people or any of them*, unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 35 (emphasis added). Samuel Adams proposed for the Massachusetts state convention's ratification of the federal Constitution that a Bill of Rights include the following: "…the said Constitution be never construed to authorize Congress to infringe the just liberty of the press, or the rights of the conscience; or to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 37 (emphasis added). These proposals, if relevant at all, do not demonstrate a historical tradition of regulation akin to § 922(g).

As an initial matter, the proposals are an exceptionally weak form of evidence. None made it into the final text. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (explaining *expressio unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals

in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 604. That is because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id*. If these proposals really codified previous practice, the government should be able to point to Founding-era laws imposing similar firearms restrictions. Yet no such laws exist.[4]

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals arising from state conventions. The conventions in Rhode Island and New York proposed an unqualified version of the Second Amendment right, "[t]hat the people have a right to keep and bear arms[.]" 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836).

Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, two did not. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006).

---

[4] Indeed, these proposals contradict early American practice. For example, New Hampshire's "actual rebellion" limitation, *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting), contradicts Massachusetts' promise to store and return the firearms of the instigators of Shay's Rebellion after three years. Nor can Samuel Adams and the Pennsylvania minority's proposal to limit arms to the "peaceable" be squared with early American surety laws that permitted the people "reasonably likely to 'breach the peace'" to still carry guns if they could (1) "prove a special need for self-defense" or (2) "post a bond before publicly carrying a firearm." *Bruen*, 142 S. Ct. at 2148.

Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Yet even if one assumes that the proposed limitations shed light on the actual Second Amendment's meaning, it does not legitimize § 922(g)(9). The former proposed some restrictions on arms for those who engaged in rebellion or violence.[5] The latter bars firearm possession for anyone convicted of a misdemeanor that involves domestic violence. Those are not close to analogous. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar v. U.S. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same).

### 3. There is no historical tradition of disarming "unvirtuous" citizens.

The government may attempt to argue that 18 U.S.C. 922(g)(9) is supported by the historical tradition of disarming "unvirtuous citizens," insofar as the right to bear arms was

---

[5] Given founding-era practice, the Pennsylvanian antifederalists' proposal cannot seriously be read to suggest that anyone convicted of *any* offense lacks a right to bear arms. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (noting that "no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants").

historically understood as requiring a well-regulated militia who could be expected to use firearms responsibly for the good of the nation. *See, e.g., Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (holding that the government may bar the unvirtuous from exercising their Second Amendment rights). Such argument lacks historical support and is incompatible with modern constitutional doctrine. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting).

First, there is no primary source evidence linking the arms right to a person's virtuousness. Some historians have cited one another to support the "virtue" theory, but they have not identified any supporting founding-era materials beyond the three proposals from state conventions discussed above. *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting) (comparing the authorities supporting a virtuousness limitation to a "matryoshka doll").

Even among academics the theory's merits are far from settled, and scholars disagree about its legitimacy. *Greenlee*, *supra* at 275. "No court nor any source a court has cited has provided any founding-era law disarming 'unvirtuous' citizens." *Id*. at 282.

To the extent that history suggests that the Framers stripped the unvirtuous of certain rights—it was civic rights (such as jury service or voting), not individual rights (such as the freedom of speech). *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).

Second and more problematically, the "virtuous citizen" theory rests on the premise that firearm rights were historically limited to those who could serve on the militia. The "virtuous citizen" theory can be traced to a 1983 law review article by Don Kates, and Gary G. Colbath in private practice, who opined that "the ideal of republican virtue was the

armed freeholder, upstanding, scrupulously honest, self-reliant and independent—defender of his family, home and property, and joined with his fellow citizens in the militia for the defense of their polity." *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983).

This collectivist reading of the Second Amendment – one that would limit its application to "virtuous" citizens – is incompatible with *Heller*. As several Third Circuit judges noted:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by [scholars] . . . who rejected the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well-regulated militia."

*Binderup v. U.S. Att'y Gen.,* 836 F.3d 336, 368 (3d Cir. 2016) (*en banc*) (Hardiman, J., concurring).

In sum, the Founding generation did not recognize a "virtuous citizen" limitation on the right to bear arms. The text of the Second Amendment is instructive. That the framers recognized an unqualified right to bear arms by "the People" is compelling evidence such limits on firearm possession are not baked into the Second Amendment.

### 4. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to early American laws that disarmed "dangerous" groups of people such as slaves, freed Blacks, and Native Americans.

The Government may also attempt to argue that laws like § 922(g)(9) are analogous to laws that existed during the early years of the American republic which disarmed groups

of people considered to be "dangerous," such as slaves, freed Blacks and Native Americans. Any passing resemblance between § 922(g)(9) and these racialized disarmament laws is far too attenuated to survive Second Amendment scrutiny.

Various 17th, 18th, and 19th century statutes criminalized the selling or trading of weapons to Indians. *See, e.g.*, Howard Nemerov, *Four Hundred Years of Gun Control…Why Isn't It Working?* 2 (2008). There are also examples of early gun control laws that were concerned with disarming Black people, both enslaved and free. *See*, Clayton E. Cramer, The Racist Roots of Gun Control, 4 Kan. J.L. & Pub. Pol'y 17 (1994). For example, a Virginia law from 1640 provided that all persons "except negroes" shall be provided with arms and ammunition or be fined at pleasure of the Governor and Council. *Id.* at 4. Black disarmament laws increased especially after Nat Turner's Rebellion of 1831, and by 1834, gun bans for Black people began appearing in state constitutions. *Id.* at 5-6. *See, e.g.*, Tenn. Const. art. 6, § 26. (1796) ("that the free white men of this State have the right to keep and bear arms…").

Drawing a parallel between today's modern firearm laws and these kinds of laws rests on the tenuous reasoning that *any* law disarming groups of supposedly "dangerous" persons are constitutional. But such historical examples are fundamentally different than today's modern firearms laws because they were motivated by a desire to impose racial hierarchies and reduce the ability of disfavored groups – i.e., Blacks and Native Americans – to defend themselves. Obviously, racist fears of armed uprising against government oppression by non-white persons are far-removed from the kinds of public safety justifications used to support modern firearm laws.

Even if the Government could establish some kind of weak association with these Founding-era laws, the Government is prohibited from relying on analogical reasoning in the first place. According to *Bruen*, a court is entitled to engage in the analogical inquiry – i.e., comparing existing regulations to historical antecedents only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.*

The potential danger posed by domestic violence perpetrators accessing firearms would have been neither "unprecedented" nor "unimaginable" to the Founders. As a result, the Government cannot rebut the presumption of unconstitutionality by invoking racial disarmament laws as historical analogues to § 922(g)(1). *Id.* at 2133.

5. **The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to laws that prohibited possession of firearms by traitors and those who were suspected of disloyalty to the Nation.**

Many of the laws enacted around the time of the Founding and ratification of the Second Amendment were in response to the fear of people rebelling against American colonists or committing treason in support of the British.

Certain people, such as British loyalists or those who refused to take loyalty oaths to their state, were regarded as "dangerous" and thus were stripped of certain civic rights, including their right to possess firearms, for fear of their rebellion against the newly founded United States. To the extent that the new Nation sought to disarm classes of people, the regulatory approach was a far cry from § 922(g)(9).

For example, the Virginia colony, like England, disarmed Catholics, still viewed as traitors to the crown, who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But there was an exception for weapons allowed by a justice of the peace "for the defense of his house and person." George I, stat. 2, c. 13 (1714); and "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, Statutes at Large, 7:35.

In 1787, after Massachusetts suffered an armed uprising known as Shays' Rebellion, the state passed a law prohibiting individuals "who have been or may be guilty of Treason, or giving Aid or Support to the present Rebellion," from possessing arms. 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805, 145-48 (1805). However, this prohibition only lasted for three years. *Id.* Massachusetts law required the Commonwealth to hold and then return the rebels' arms after that period. Sec'y of the Commonwealth, Acts and Resolves of Massachusetts 1786–87, at 178 (1893).

In other words, persons involved in one of the most serious violent crimes—armed rebellion—suffered a three-year firearm ban and promise to return the weapons used to attack the new government. This is radically different from a categorical, lifetime ban on possession of all firearms.

As *Bruen* instructs, where earlier generations regulated a societal problem through "materially different means," such evidence supports the conclusion that the modern firearm regulation violates the Second Amendment. 142 S. Ct. at 2131.

**6. The Government cannot establish an historical tradition of permanently disarming persons accused of violence.**

Finally, colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. At various times, the United States regulated—but not banned—firearm possession by those feared to be violent. *See Bruen*, 142 U.S. at 2148 (holding that 19th century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond). But such laws are materially dissimilar from § 922(g)(9). There is no evidence of a precursor to § 922(g)(9)'s broad, class-based ban. In fact, there are at least two documented instances where attempts to disarm a class of offenders was rejected as inconsistent with the right to bear arms.

First, as with Shay's Rebellion, Congress declined to disarm southerners who fought against the Union in the Civil War. *Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004). The reason: some northern and Republican senators feared that doing so "would violate the Second Amendment." *Id.*

Second, when a Texas law ordered that people convicted of unlawfully using a pistol be disarmed, it was struck down as unconstitutional. *Jennings v. State,* 5 Tex. Ct. App. 298, 298 (1878). The Texas Court of Appeals—then the state's highest court for criminal cases—held:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having arms for his own defence and that of the State. This right is one of the surest safeguards of liberty and self-

preservation.

*Id.* at 300–01 (emphases added).

Although Jennings interpreted Texas's constitution, not the Second Amendment, its analysis is indicative of how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past. Jennings' setting is notable. As *Bruen* held, 1870s Texas otherwise imposed unusually strict firearms regulations. 142 S. Ct. at 2153.

In sum, the 19th century history provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional. Not only was there a consistent practice of allowing people who broke the law to keep weapons for self-defense—at least one state appellate court and Congress agreed that disarming lawbreakers was unconstitutional.

As *Bruen* aptly notes: "[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131. History supports this and provides strong evidence confirming that blanket prohibitions like § 922(g)(9) violate the Second Amendment and simply cannot stand.

## III.    CONCLUSION

Counts 1-3 of the indictment allege that Mr. Ryno possessed firearms in violation of 18 U.S.C. § 922(g)(9). This law is unconstitutional as applied to Mr. Ryno because the government cannot "meet [its] burden to identify an American tradition" that prohibited people with *misdemeanor* domestic violence convictions from possessing firearms. *Bruen*,

142 S. Ct. at 2138. At a minimum, the government must present evidence of a historical tradition that would have prohibited a person in Mr. Ryno's circumstances from possessing a firearm. If it cannot, the Court must dismiss Counts 1-3 of the indictment.

DATED at Anchorage, Alaska this 26th day of October, 2022.

Respectfully submitted,

*/s/ Gary G. Colbath*

Gary G. Colbath
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on October 26, 2022. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.

*/s/ Gary G. Colbath*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOEL MICHAEL RYNO,<br><br>Defendant. | Case No. 3:22-cr-00045-JMK-MMS<br><br>*Proposed* **ORDER RE MOTION TO DISMISS BASED ON NEW YORK RIFLE & PISTOL ASS'N V. BRUEN** |

After due consideration of Defendant's Motion to Dismiss Based on New York

Rifle & Pistol Association v. Bruen, it is GRANTED.

DATED this __ day of October, 2022, in Anchorage, Alaska.

_____
District Judge Joshua M. Kindred
UNITED STATES DISTRICT COURT