S. LANE TUCKER
United States Attorney

KELLY CAVANAUGH
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: seth.brickey-smith@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JOEL MICHAEL RYNO.<br><br>    Defendant. | Case No. 3:22-cr-00045-JMK-MMS |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

COMES NOW the United States of America by and through the U.S. Attorney and undersigned counsel with an opposition to the defendant's motion to dismiss the Indictment in this matter pursuant to the Second Amendment.

On three separate occasions after previously being convicted of domestic violence misdemeanor offenses, the defendant was found in illegal possession of firearms. A grand jury indicted him for violating 18 U.S.C. § 922(g)(9), which largely prohibits individuals that have previously been convicted of misdemeanor domestic violence

assaults from possessing firearms. The defendant now argues that the Court is required to dismiss this charge, because the Second Amendment gives individuals with this prohibition like him an unqualified right to keep and bear arms. Moreover, dismissal of the indictment would be inappropriate because the Second Amendment right to keep and bear arms does not give dangerous criminals a right to own dangerous weapons.

## DISCUSSION

Federal Rule of Criminal Procedure 12(b) permits a pretrial motion to dismiss "that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). However, in ruling on such a motion, "the district court is bound by the four corners of the indictment." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The motion "cannot be used as a device for a summary trial of the evidence." *Id.* The "unavailability of Rule 12 in determination of general issues of guilt or innocence . . . helps ensure that the respective provinces of the judge and jury are respected[.]" *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993). The defendant's motion to dismiss raises a single argument, that Section 922(g)(9) violates the Second Amendment under *Bruen*, 142 S. Ct. 2111. But his argument fails in light of the Supreme Court's Second Amendment jurisprudence, the text of the Second Amendment, and the historical understanding of the right to keep and bear arms.

### I. FACTUAL AND PROCEDURAL HISTORY

In 3PA-17-01151 CR, the defendant was convicted on April 19, 2019, for a misdemeanor assault that occurred in the shared home between the defendant and his girlfriend in the presence of their shared child.

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS          Page 2 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 2 of 20

In 3PA-19-02536 CR, the defendant was convicted on June 15, 2021, for another misdemeanor assault on the same individual in the home they shared in the presence of their shared child.

In December 2020, Alaska State Troopers (AST) observed several pieces of firewood along the Glenn Highway in Glennallen, Alaska and then observed two trucks with trailers stacked with firewood that was not secured. The defendant was the driver of one of those vehicles. AST inquired if either driver had any firearms, the defendant offered he had a .22 caliber rifle in the front of his truck. The defendant was on conditions of release at the time and one of those conditions was not to be in possession of a firearm. The firearm was a Remington, Model: 597, .22 cal., loaded with 10 rounds of ammunition.

On February 24, 2022, AST responded to a residence in Big Lake, Alaska regarding a domestic violence disturbance, the defendant was present at the scene. AST had an active search warrant for the defendant's person. The defendant then informed AST he was carrying a concealed firearm in a shoulder holster. This was seized pursuant to the search warrant and was discovered to be a loaded Glock, Model: 17, Cal: 9mm, and two additional loaded magazines.

On February 28, 2022, the defendant was interviewed by AST and an ATF Special Agent in Palmer, Alaska. The defendant acknowledged his 2017 conviction and a current domestic violence restraining order, but believed he was able to possess firearms as part of that order. The defendant was then directed to the language on page 6 of the order: "If you possess a firearm and ammunition while this order is in effect, you may be charged

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS     Page 3 of 20
Case 3:22-cr-00045-JMK-MMS    Document 31    Filed 11/01/22    Page 3 of 20

with a federal offense even if paragraphs (D)(1)(k) and (D)(1)(l) of this order do not prohibit you from possessing these items. [18 USC §922(g)]."

On April 16, 2022, AST did a welfare check on a report of an individual passed out behind the wheel of a vehicle on the Palmer/Wasilla Highway near Golden Hills Drive. The defendant was contacted as the driver of the vehicle. The defendant was armed at the time of contact and consented to allow AST to collect both firearms from his person and the vehicle.

The defendant was indicted by a federal grand jury on three counts of Prohibited Person in Possession of Firearms, in violation of 18 U.S.C. § 922(g)(9) on May 17, 2022. The motions deadline was reset several times in anticipation of pre-trial motions being filed. At present there is not a scheduled trial date.

## II. ARGUMENT

### I. Section 922(g)(9) is Constitutional.

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In recent years, the Supreme Court has developed a framework to analyze Second Amendment challenges. In *District of Columbia v. Heller*, the Supreme Court considered whether a law in the District of Columbia, which effectively "ban[ned] handgun possession in the home" for private citizens, ran afoul of the Second Amendment. 554 U.S. 570, 635 (2008). After a lengthy textual and historical analysis, the Supreme Court concluded that the Second Amendment protects the right of law-abiding, responsible citizens to possess a handgun in the home

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS　　　　Page 4 of 20
Case 3:22-cr-00045-JMK-MMS　　Document 31　　Filed 11/01/22　　Page 4 of 20

for lawful purposes, like self-defense. *Id.* at 576–635. But "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Indeed, the Supreme Court cautioned that nothing in *Heller* "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* These restrictions, the Supreme Court explained, were a non-exhaustive list of "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Most recently, in *Bruen*, the Supreme Court considered whether a New York law that required individuals prove "proper cause exist[ed]" to carry a firearm in public comported with the Second Amendment. 142 S. Ct. 2122–23. Before discussing the merits of the case, the Court observed that since its decision in *Heller*, the Courts of Appeals had widely adopted a "two-step" framework to determine whether a firearm regulation violated the Second Amendment. *Id.* at 2126; *see e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). The lower courts's two-part analysis "(1) ask[ed] whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, direct[ed] courts to apply an appropriate level of scrutiny"—ranging from immediate to strict scrutiny. *Chovan*, 735 F.3d at 1136–38.

The Supreme Court approved of the first step of the two-step analysis as being "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS           Page 5 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 5 of 20

informed by history." *Bruen*, 142 S. Ct. at 2128. But the *Bruen* majority rejected the second step of the Court of Appeals's post-*Heller* framework, despite its popularity. *Id.* It explained that *Heller* expressly declined to apply means-end scrutiny to firearm regulations and that courts "must assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2129–31. When applying the analysis articulated in *Bruen*, a court must first consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If so, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

The Ninth Circuit has held that, even in the wake of *Heller*, the federal prohibition on felons carrying concealed weapons "does not violate the Second Amendment". *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). Other courts of appeal arrived at the same result. *See, e.g.*, *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010).

*Vongxay* has not been overruled by an en banc court or the Supreme Court. As such, its holding that § 922(g)(1) does not violate the Second Amendment is binding on other courts in the Ninth Circuit unless it has been "'effectively overruled'" because it is "'clearly irreconcilable' with 'intervening Supreme Court authority.'" *Apache Stronghold v. United States*, 38 F.4th 742, 763 (9th Cir. 2022) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003)).

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS   Page 6 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 6 of 20

*Bruen* held that when evaluating a Second Amendment challenge, a court should consider whether "the Second Amendment's plain text covers an individual's conduct". *Id*. at 2126. If so, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. This analytical framework is "[i]n keeping with *Heller*". *Id*.

Indeed, not only does nothing in *Bruen* undermine the *Heller* and *McDonald* doctrine that the right to bear arms belongs to law-abiding citizens rather than dangerous criminals: if anything, it reinforces that point:

> [T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, *law-abiding* citizens have a similar right to carry handguns publicly for their self-defense. *Bruen*, 142 S.Ct at 2122
>
> The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of *law-abiding, responsible* citizens to use arms" for self-defense. *Id*. at 2131 (quoting *Heller*, 554 U.S. at 635).
>
> It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding*, adult citizens—are part of "the people" whom the Second Amendment protects. *Id*. at 2134.
>
> None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent *law-abiding* citizens with ordinary self-defense needs from carrying arms in public for that purpose. *Id*. at 2150. (Emphasis added.)

The court also noted that a state could legitimately "require applicants to undergo a background check" in order to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. at n.9 (quoting *Heller*, 554 U.S. at

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS          Page 7 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 7 of 20

635.). Such an acknowledgement is impossible to reconcile with the defendant's claim that the state and federal governments were precluded from disarming him. And two members of the majority expressly reaffirmed the recognition in *Heller* and *McDonald* that "longstanding prohibitions on the possession of firearms by felons" did not violate the Second Amendment. *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).

Notably, the animating concern in *Bruen* was the fact that certain "Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.' *Id*. at 2125. This latter step, the court concluded, "it is one step too many [, because] *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 2127.

But *Vongxay* did not rely on this inappropriate second step. Rather, the court relied on the conclusion that, at ratification, "the right to bear arms was 'inextricably ... tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).'" 594 F.3d at 1118 (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)). Indeed, the court noted that a ban on felons possessing firearms "is also *consistent* with the explicit purpose of the Second Amendment to maintain 'the security of a free State.'" *Id*. at 1117 (emphasis added). Because nothing in *Vongxay*'s conclusion is even particularly in tension with *Bruen*—much less irreconcilably so—the holding remains binding here.

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS         Page 8 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 8 of 20

## A. Possession of Firearms by Those Convicted of Misdemeanor Crimes of Domestic Violence is not Protected by the Plain Text of the Second Amendment.

Section 922(g)(9) criminalizes the possession of firearms by any person "who has been convicted in any court of a misdemeanor crime of domestic violence." This restriction does not run afoul of the Second Amendment, because the right described by the Second Amendment only extends to "the people"—*i.e.* "law-abiding, responsible" citizens keeping or bearing arms for "lawful purposes." *See Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156. In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by *law-abiding citizens* for lawful purposes." 554 U.S. at 625 (emphasis added). *Heller* expressly contemplated that certain citizens were "disqualified" from keeping or bearing arms under Second Amendment. *Id.* at 635. ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). This interpretation of the Second Amendment's meaning "accords with the historical understanding of the scope of the right." *Id.* at 625.

Similarly, in *Bruen*, the Court began its textual analysis by underscoring "that petitioners . . . —*two ordinary, law-abiding, adult citizens*—are part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. *Bruen* did not question the constitutionality of "shall-issue" concealed-carry licensing regimes, employed by 43 states, that "require applicants to undergo a background check or pass a firearms safety

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS     Page 9 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 9 of 20

course" to ensure that "those bearing arms" are "'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes . . . they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry."). Because both *Bruen* and *Heller* define the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156, or "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2122, 2134, violent criminals fall outside the Second Amendment's protection. In sum, those who have been convicted of a misdemeanor crime of domestic violence are neither "law-abiding" or "responsible," and therefore are not guaranteed the right to possess firearms under the Second Amendment.

Moreover, excluding lawbreakers from "the people" as contained the text of the Second Amendment is consistent with scholarly opinions on the subject. As the Ninth Circuit observed in *United States v. Vongxay*,

> [M]ost scholars of the Second Amendment agree that the right to bear arms was "inextricably . . . tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike," and that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . ."

594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986)); *see also* THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 40 (Boston, Little Brown & Co. 1890) (explaining that constitutions protect rights for "the People" excluding, among

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS			Page 10 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 10 of 20

others, "the idiot, the lunatic, and the felon"). Accordingly, the plain text of the Second Amendment does not guarantee those convicted of misdemeanor crimes of domestic violence the right to possess a firearm.

### B. Prohibiting Those Convicted of Misdemeanor Crimes of Domestic Violence from Possessing Firearms is Consistent with this Nation's Historical Tradition of Firearm Regulation.

Even if the Second Amendment's plain text protects the right of perpetrators of domestic violence to possess firearms, Section 922(g)(9) "is consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. Under this part of the analysis, courts look to "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id.* at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Among the features that make regulations fit for comparison, is "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. In other words, where a historical and modern regulation impose similar burdens for similar reasons, they are more appropriate for analogy. While certain firearms regulations may have direct analogies to permissible restrictions present at the founding, some comparisons may "require a more nuanced approach" due to "societal concerns or dramatic technological changes." *Id.* at 2132.

The lengthy historical analysis in *Bruen* warns of the various pitfalls in evaluating historical analogues. For example, *Bruen* explains "English common-law practices and

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS        Page 11 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 11 of 20

understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution" and that "it [is] better not to go too far back into antiquity for the best securities of our liberties." *Id.* at 2136. By the same token, the Supreme Court cautioned "against giving post-enactment history more weight than it can rightly bear" when interpreting a constitutional command. *Id.* Courts must, therefore, carefully navigate between the Scylla of antiquity and the Charybdis of recency to determine what the Framers understood the scope of the Second Amendment to be.

To assist courts in this endeavor, *Bruen* highlighted three historical indicators that a firearms regulation was unconstitutional. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Second, where the societal problem has historically been addressed by means other than firearms regulation, that may serve as evidence that the challenged regulation is unconstitutional. *Id.* Third, if jurisdictions attempted to enact similar regulations that were rejected on constitutional grounds, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

### 1. Section 922(g)(9): A Brief History.

The first federal statute disqualifying felons from "receiving" firearms was not enacted until 1938; it also disqualified misdemeanants who had been convicted of violent offenses. Federal Firearms Act, Pub.L. 75–785, 52 Stat. 1250, 1251. Under the federal Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, felons, fugitives, drug addicts, and

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS   Page 12 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 12 of 20

"mental defectives" were disqualified from possessing firearms. The Gun Control Act of 1968 provided a summary of Congress's purpose for the new regulations contained in Section 922(g):

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition possession, or use of firearms appropriate to the purpose of . . . personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes . . .

Pub. L. No. 90-618, § 101, 82 Stat. 1213. This prefatory purpose to the statute accords with other contemporaneous legislative materials, which shed additional light on what societal problems Congress sought to address with Section 922(g). *See* S. REP. NO. 90-1501, at 22 (1968) ("The ready availability; that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern").

Indeed, the Supreme Court has interpreted the Omnibus Crime Control Act and Safe Street Act, as amended by the Gun Control Act and subsequent amendments, as evincing a congressional purpose of keeping firearms out of the hands of criminals. *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding the legislative history of these statutes supports the view that Congress sought disarm those who may not be trusted to possess a firearm); *Barrett v. United States*, 423 U.S. 212, 220 (1976)

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS          Page 13 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 13 of 20

(explaining that the "principal purpose" of federal gun control legislation "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency"); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (same).

In 1996, Congress extended the Section 922(g)'s prohibition to include persons convicted of "a misdemeanor crime of domestic violence." 18 U.S.C. § 922(g)(9). Congress enacted Section 922(g)(9) out of concern that guns were not being kept away from domestic abusers under the felon-in-possession laws because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." *United States v. Skoien*, 614 F.3d 638, 643 (7th Cir. 2010) (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg) (internal quotation marks omitted)); *see also United States v. Hayes*, 555 U.S. 415, 426 (2009). Through § 922(g)(9), "Congress sought to 'close this dangerous loophole' and 'establish [ ] a policy of zero tolerance when it comes to guns and domestic violence.'" *United States v. Booker*, 644 F.3d 12, 16 (1st Cir. 2011) (quoting 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (internal quotation marks omitted) (emphasis added)). Thus, the legislative history of § 922(g)(9) shows that Congress intended to keep firearms out of the hands of a specific type of violent criminal—domestic abusers.

### 2. Historical Analogues to Section 922(g)(9).

As *Bruen* instructs, appropriate historical analogues to Section 922(g)(9) will be similar in "how and why the regulations burden a law-abiding citizen's right to armed

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS       Page 14 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 14 of 20

self-defense." 142 S. Ct. at 2132–33.¹ Section 922(g) is a statute that criminalizes the possession of firearms by various classes of people. As explained, "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people" including unlawful drug users and addicts. *See Yancey*, 621 F.3d at 683.

Some of the most readily analogous firearms regulations to Section 922(g)(9) are those that prohibit the possession of firearms by criminals. "[By prohibiting possession by felons,] Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough*, 431 U.S. at 572 (internal quotation marks omitted). Similarly, the congressional intent in passing § 922(g)(9) was to keep firearms out of the possession of domestic abusers. *See Hayes*, 555 U.S. at 426. Due to their willingness to engage in unlawful activity, Section 922(g) identifies both felons and perpetrators domestic violence as being "presumptively risky" and unfit to possess firearms.

There is ample historical support for regulations disarming criminals like those described in Section 922(g)(1) and (g)(9). The Supreme Court has "identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (quoting *Heller*, 554 U.S. at 604). That report recognized the permissibility of imposing a firearms disability on convicted

---

¹ Importantly, Section 922(g)(9) disarmament of perpetrators of domestic violence does nothing to burden the rights law-abiding citizens in any respect. It is therefore unclear whether the Supreme Court intended *Bruen*'s analogical analysis to apply to restrictions unrelated to law-abiding citizens.

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS            Page 15 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 15 of 20

criminals and made no distinction as to the type of criminal, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Id*. (quoting 2 Bernard Schwartz, Th*e Bill of Rights: A Documentary History* 662 and 665 (1971)) (emphasis added). Samuel Adams offered a similar amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights* at 674–75, 681 (emphasis added). In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640. These proposals reflect a contemporary belief during the Founding Era that the government could disarm a person for *any* crime, not just a felony.

Moreover, there is a robust historical tradition of disarming people convicted of a "crime of violence." *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harvard Journal of Law & Public Policy 695, 701 (2009). In this regard, the right to bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote, *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974); the right to serve on a jury, 28 U.S.C. § 1865(b)(5); and the right to hold public office, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998). Just as Congress and the states have required convicted felons to forfeit other civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sherriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J.,

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS                Page 16 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 16 of 20

concurring in judgment).

This conclusion generally aligns with the historical practice of disarming people the Framers deemed to be dangerous or untrustworthy, such as those unwilling to swear an oath of allegiance to the colonies or the states, slaves, freed blacks, and Native Americans. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–08 (2004) ("The law demonstrates that in a well-regulated society, the state could disarm those it deemed likely to disrupt society."). Although many of these laws were motivated, at least in part, by racial animus, they are nevertheless quintessential features of "this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126; *see also United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo–American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."). Against this historical backdrop of disarmament, it is no surprise that every circuit to decide the issue has held statutes prohibiting felons from possessing firearms does not violate the Second Amendment. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); *Stimmel v. Sessions*, 879 F.3d 198, 210 (6th Cir. 2018); *United States v. Rozier*, 598 F.3d 768, 771

U.S. v. Ryno
3:22-cr-00045-JMK-MMS            Page 17 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 17 of 20

(11th Cir. 2010); *In re U.S.*, 578 F.3d 1195, 1200 (10th Cir. 2009).

Critically, *Heller* held that the "longstanding prohibitions on the possession of firearms by felons" comport with the Second Amendment, which only protects the "right of law-abiding, responsible citizens" to possess a firearm. *Heller*'s commentary on these restrictions is not mere dicta. *Vongxay*, 594 F.3d at 1115. Indeed, the Supreme Court has repeatedly assured the presumptive validity of such laws under its Second Amendment holdings. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). *Bruen* did nothing to disturb the decision in *Heller*. It only reiterated that the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Justice Kavanaugh, joined by Chief Justice Roberts in a concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes. *Id.* It did not reach "shall-issue" licensing regimes—which commonly disqualify felons, the mentally ill, and drug users. *Id.* These regimes, Justice Kavanaugh suggests are constitutional. *Id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Both history and the Supreme Court's Second Amendment jurisprudence strongly demonstrate that disarming violent criminals is "consistent with this Nation's historical tradition of firearm regulation." Indeed, both federal district courts to have decided the

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS            Page 18 of 20
Case 3:22-cr-00045-JMK-MMS    Document 31    Filed 11/01/22    Page 18 of 20

issue post-*Bruen* has held that Section 922(g)(9) does not violate the Second Amendment. *See United States* v. *Nutter*, No. 2:21-cr-142, 2022 WL 3718518 (S.D. W.Va. Aug. 29, 2022); *United States* v. *Jackson*, No. 5:22-cr-59, 2022 WL 3582504 (W.D. Ok. Aug. 19, 2022).

Even more district courts have considered and upheld the analogous Section 922(g)(1) since *Bruen*. *See United States v. Charles,* No. 7:22-cr-154 at ECF No. 48 (W.D. Texas October 3, 2022); *United States v. Williams*, No. 3:21-cr-478 (S.D. Cal. September 30, 2022) (oral bench ruling); *United States v. Campbell*, No. 5:22-cr-138 (W.D. Ok. September 27, 2022) (order); *United States v. Perez*, No. 3:21-cr-508 (S.D. Cal. September 26, 2022); *United States v. Collette*, No. 7:22-cr-141 at ECF No. 66 (W.D. Tex. September 25, 2022); *United States v. Hill*, No. 3:21-cr-107 (S.D. Cal. September 20, 2022); *United States v. Rojo*, No. 3:21-cr-682 (S.D. Cal. September 14, 2022) (oral bench ruling); *United States v. Cockerham*, No. 5:21-cr-6 at ECF No. 31 (S.D. Miss. September 13, 2022); United States v. Havins, No. 3:21-cr-1515 (S.D. Cal. September 12, 2022) (oral bench ruling); *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. September 9, 2022) (oral bench ruling); *United States v. Doty*, 5:21-cr-00021 at ECF No. 34 (N.D. W. Va. Sep. 9, 2022); *United States v. Burrell*, 3:21-cr-20395 at ECF No. 34 (E.D. Mich. Sep. 7, 2022); *United States v. Nevens*, 2:19-cr-00774 at ECF No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Ingram*, 2022 WL 3691350 (D.S.C. Aug. 25, 2022); *United States v. Adams*, 1:20-cr-00628 (S.D.N.Y. Aug. 10, 2022) (oral bench ruling); *United States v. Ramos*, 2:21-cr-00395 at ECF No. 31 (C.D. Cal. Aug. 5, 2022); *United States v. Maurice*, No. 7:22-cr-00048 at ECF No. 48 (S.D.N.Y. July 14, 2022). The unanimous weight of

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS    Page 19 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 19 of 20

authority further demonstrates that the defendant's arguments are fundamentally unsound.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion to Dismiss and uphold Section 922(g)(9) as constitutional.

RESPECTFULLY SUBMITTED November 1, 2022 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*/s Kelly Cavanaugh*
KELLY CAVANAUGH
Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2022
a true and correct copy of the foregoing
was served electronically on:

Gary Colbath

*/s Kelly Cavanaugh*
Office of the U.S. Attorney

*U.S. v. Ryno*
3:22-cr-00045-JMK-MMS        Page 20 of 20
Case 3:22-cr-00045-JMK-MMS   Document 31   Filed 11/01/22   Page 20 of 20