# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

JOEL MICHAEL RYNO,

                Defendant.

3:22-CR-00045-JMK-MMS

**FINAL REPORT AND
RECOMMENDATION ON
MOTION TO SUPPRESS [DKT. 30]**

## I.    Motion Presented

In the summer of 2022, the Supreme Court rejected a two-step, tiered scrutiny framework that a panoply of Courts of Appeal had adopted for Second Amendment cases. In its stead, the Supreme Court fashioned a framework based in textual analysis, history, and tradition. To state the obvious—this Judicial Officer is not a trained historian. Historians sift through the vast historical record, applying pedagogical historical methodologies, in an effort to reconstruct, or to understand, the past. To further state the obvious, the work of a historian is unconstrained by such exigencies as the Speedy Trial Clock. Historians need not provide definitive answers because the historical materials exist in a dialectic, and may not support any one conclusion. The federal judiciary is not similarly situated. Definitive conclusions must be reached. This need to provide conclusions for Cases and Controversies, heightens the risk of biasing a federal court's historical inquiry towards a result-driven conclusion. While the federal judiciary represents a unitary branch

of government, the individual courts which comprise the judiciary are heterogeneous. The Supreme Court is a well-staffed enterprise, located under one roof, that benefits from a broad swath of amicus curiae briefs. More importantly, the Supreme Court is vested with the ability to overturn judicial precedent. The ninety-four districts that comprise the "inferior Courts" are constrained by the speedy-trial clock, by varying degrees of available staff, and as it occurred here, by binding precedent that may be in conflict. Like the Supreme Court has since 2008, this Court will do what it can with what it has in the record. This Court notes that Magistrate Judge Kyle F. Reardon, in a trenchant and well-reasoned Report and Recommendation, has recommended denial of a separate, as-applied § 922(g)(9) challenge. *See United States v. Padgett*, Case No. 3:21-CR-00107-TMB-KFR (D. Alaska 2023).

To that end, this Court commends both parties for tackling the complex questions before this Court. Both parties thoroughly and zealously rose to the task of effectively surveying this Nation's Second Amendment history. This Court's historical approach is therefore simplified: this Court will rely on the cited history, on case law that interprets that history, and on an independent historical survey to ensure a careful review of the historical record. Because this is not a run-of-the-mill interpretation of a statute where the black-letter law speaks for itself, legislative history and history of ratification debates will not be excluded. Both parties also cite out-of-circuit cases and district court cases. The citations are good-faith efforts by both parties that, as a result, have created a robust consensus of persuasive authority. This Court will take the unusual step of referring to such authority to the extent that it bears relevance or analytical weight. In other words, the

historical record compiled by both parties has produced a sufficiently developed record to recommend a ruling on Ryno's Motion.

*Bruen* ultimately requires a different path from the tiered scrutiny framework, but it is a path that leads to the same conclusion. Ryno is part of "the people," and his conduct is therefore covered by the plain text of the Second Amendment; but the government has demonstrated that 18 U.S.C. § 922(g)(9), as-applied to Ryno, comports with our Nation's history and tradition because § 922(g)(9) is relevantly similar to historical analogues from the Founding era.

This Court hereby issues its Final Report and Recommendation regarding Ryno's Motion to Dismiss. Dkt. 30. Ryno's Motion to Dismiss should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

## II.   Factual and Procedural History

This Court reminds the parties that as-applied challenges require a set of particular facts to assess a statute's validity as to a particular litigant. Important here is that Ryno, in his reply brief, did not challenge the government's recitation of the facts. On that understanding, the following facts are drawn from party briefings and from the indictment. Dkt. 4; Dkt. 30; Dkt. 31.

Ryno has been twice convicted of misdemeanor crimes of domestic violence. Alaska Stat. Ann. § 11.41.230(a)(1) ("A person commits the crime of assault in the fourth degree if that person recklessly causes physical injury to another person."); Dkt. 4 at 2-3; Dkt. 30 at 4; Dkt. 31 at 2-3. In April 2019, Ryno was first convicted of domestic violence against his domestic partner at their shared residence, and in the presence of their child.

3

Dkt. 31 at 2. In December 2020, Ryno violated a condition of release when law enforcement stopped his vehicle and discovered that Ryno was in possession of a rifle and ammunition. Dkt. 4 at 1-2; Dkt. 30 at 4; Dkt. 31 at 3. Ryno's second conviction for domestic violence occurred in June 2021. Dkt. 4 at 2-3; Dkt. 31 at 3. Ryno again assaulted the same domestic partner, again in the presence of their child. Dkt. 31 at 3.

In February 2022, Ryno was on the premises of a "domestic violence disturbance" that law enforcement responded to. Dkt. 31 at 3; Dkt. 30 at 4. It is unclear whether Ryno was charged or convicted with another crime of domestic violence. What is clear is that Ryno had an "active search warrant" [*sic*] and notified law enforcement that he possessed a firearm and ammunition. The firearm was subsequently seized. *Id.*; *Id.* Two law enforcement agencies interviewed and advised Ryno of the importance of abiding by the long-term protective order from his 2019 conviction, which among other things, prohibited him from possessing firearms. *Id.*; *Id.* The government alleges that Ryno "believed he was able to possess firearms as part of that order." Dkt. 31 at 3. The relevant language of the protective order is as follows: "If you possess a firearm and ammunition while this order is in effect, you may be charged with a federal offense even if [certain] paragraphs of this order do not prohibit you from possessing these items [18 USC §922(g)]." [*sic*] *Id.* Two months later, law enforcement conducted a "welfare check" on a public highway, based on "a report of an individual passed out behind the wheel of a vehicle." Dkt. 31 at 4; Dkt. 30 at 4. Ryno was the vehicle's driver. *Id.*; *Id.* More firearms and ammunition were seized. *Id.*; *Id.*

The indictment, filed in May 2022, charges Ryno with three counts of possessing a firearm despite knowing he had been convicted of misdemeanor crimes of domestic violence. Dkt. 4; 18 U.S.C. § 922(g)(9); § 924(a)(2). Ryno has moved to dismiss the indictment because § 922(g)(9) is unconstitutional as applied to him.

Ryno argues that (1) *Bruen* has repudiated *Heller*'s "presumptively lawful" dicta and by extension repudiated case law that relied on the dicta; (2) this Court is therefore operating on a clean slate, and "a full historical analysis of a prohibition conducted under … *Bruen* can rebut *Heller's* presumptively lawful exceptions"; (3) "the people," under the Constitutional Amendments, includes members of the national community or alternatively, of the political community; (4) the phrase "law-abiding citizens" mentioned in Second Amendment jurisprudence, should not disqualify Ryno from "the people"; (5) there are no "distinctly similar" regulations from the founding era because 18 U.S.C. 922(g) was enacted in the 20th century; (6) the ratification debates around 1791 varied by state and cannot be historical analogues; (7) the theory of "unvirtuous citizenry" is not rooted in this Nation's history, and even if it were, the phrase erroneously refers to a collectivist view of civic rights; (8) disarmament laws that targeted "slaves, freed Blacks, and Native Americans" are tenuous and motivated by "racial hierarchies and [to] reduce the ability of disfavored groups [] to defend themselves"; (9) the history of rebellion and disloyalty are ill-suited, historical analogues; (10) and despite this being an as-applied challenge, "blanket prohibitions like § 922(g)(9) violate the Second Amendment." *See generally* Dkt. 30.

The government responds that (1) *Heller* and *Bruen* exclude Ryno from "the people" because the Second Amendment extends to "law-abiding, responsible citizens";

(2) *United States v. Vongxay*, 594 F.2d 1111, 1115 (9th Cir. 2010) has not been overruled and is not clearly irreconcilable; (3) on that understanding, this Court is bound by *Vongxay*'s reasoning that the right to bear arms was "inextricably tied to the concept of a virtuous citizenry"; (4) to demonstrate that 922(g)(9) is consistent with this Nation's history, it is important to understand the twentieth century "legislative history of § 922(g)(9) [which] shows that Congress intended to keep firearms out of the hands of a specific type of violent criminal—domestic abusers"; (5) a viable historical analogue to § 922(g)(9) is § 922(g)(1), which criminalizes the possession of firearms for felons; (6) *Heller* favorably cited a historical source that reasoned that *any* convicted criminal can be prohibited from bearing arms, or any citizen that is a "real danger of public injury" (7) many state constitutions that allowed a right to bear arms and a proposed amendment to the Constitution from the Massachusetts convention are relevant historical analogues; (8) there is a robust historical tradition of disarming citizens that were convicted of violent crimes; (9) a felon's forfeiture of their civic virtues is another historical analogue; (10) putting aside the patent and indefensible racist motivations "of disarming people the Framers deemed dangerous or untrustworthy, such as those unwilling to swear an oath of allegiance [], slaves, freed [B]lacks, and Native Americans," such historical analogues are nonetheless "quintessential features" of this Nation's history; (11) *Bruen* reiterated, and did not abrogate, the longstanding prohibitions on felons and the "mentally ill"; and (12) a chorus of district courts have upheld § 922(g)(1). *See generally* Dkt. 31.

This Court, in November 2022, held oral argument. Dkt. 39. Aside from Ryno's reply brief, no post-hearing briefs were filed. Dkt. 35; Dkt. 39. Supplemental briefing was ordered in February 2023. Dkt 50; Dkt. 51; Dkt. 53.[1]

### III.     *Heller* and Its Progeny

The Supreme Court has had three recent opportunities to develop Second Amendment jurisprudence: *District of Columbia v. Heller*, 554 U.S. 570, 573 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 749 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

The first opportunity was the landmark case that conferred a pre-existing "individual right to keep and bear arms" for self-defense. *Heller*, 554 U.S. at 595. *Heller* first interpreted the prefatory clause as stating a purpose that neither limited nor expanded the operative clause. *Id.* at 577-78. Turning to the operative clause, the Court divided the clause into separate phrases, beginning with "right of the people." *Id.* at 579. "What is more, in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. In identifying the "political community," *Heller* seemingly narrowed a previous definition that instead included the "national community" as part of the People. *Id.* at 580-81. It may have also equated "political" with "national" because there was a "strong presumption that the Second Amendment right" belonged to "all Americans." *Id.* at 581; *see also Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) ("In addition to being

---

[1] For transparency purposes, language was altered in pages 19, 22-27 of this Report and Recommendation.

analytically awkward, the scope of the right approach is at odds with *Heller* itself. There, the Court interpreted the word 'people' as referring to all Americans.") (citation cleaned up).

*Heller* went on to address "Keep and Bear Arms." 554 U.S. at 581. "Keep arms" naturally meant to "have weapons." *Id.* at 582. "Bear Arms" was not tied to a military purpose, and instead, is "simply the carrying of arms." *Id.* at 589. The natural and idiomatic meanings of words or phrases were distilled from dictionaries, from historical sources, and most importantly, from the Constitution. In other words, *Heller* undertook a methodological approach to interpret the words as they were used at the time the Second Amendment was drafted[2]. *Id.*; *see also Bruen*, 142 S.Ct. at 2127 ("In *Heller*, we began with a textual analysis focused on the normal and ordinary meaning of the Second Amendment language.") (internal quotations omitted). Taken together, "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it shall not be infringed." (internal quotations omitted) *Id.* at 592. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.*

The "law-abiding" phrase was first mentioned when the *Heller* majority addressed Justice Stevens' minority misinterpretation of *United States v. Miller*, 307 U.S. 174 (1939).

---

[2] *See also*, "In most cases, the meaning of a word is its use." *Philosophical Investigations*, Ludwig Wittgenstein (1953).

*Miller*, according to Justice Scalia, supported rather than contravened *Heller*'s ruling, "read[ing] *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. That passage recognized a limitation on the types of weapons covered by the Second Amendment. "Law-abiding citizens" was again mentioned to stress that *Heller*'s original understanding of the Second Amendment was unshaken by prior precedent, and especially so because neither the states nor the federal government had "significantly regulated the possession of firearms by law-abiding citizens." *Id.* at 625.

Yet the Second Amendment right "is not unlimited." *Id.* at 626. Tucked into this same paragraph was dicta admonishing courts that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id.* This admonition, however, was not derived from "an exhaustive historical analysis" nor was there an analysis "of the full scope of the Second Amendment." *Id.* An accompanying footnote underscored that restrictions on felons and the mentally ill were "presumptively lawful regulatory measures, [serving] only as examples; our list does not purport to be exhaustive." *Id.* at 626-27 n.26. In striking down the firearm statute, *Heller* emphasized that "[l]ike the First [Amendment], it is the very *product* of an interest balancing by the people—which Justice BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of hearth and home." (emphasis original) *Id.* at 635.

Both dissents understood *Heller*'s "law-abiding" dicta as a limitation on the class of persons that the Second Amendment protects. *Id.* at 644, 701-02. This limitation, the dissents contended, failed to "harmonize its conflicting pronouncements" because "the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions." *Id*; *see also Id.* at 652 ("Indeed, not a word in the constitutional text even arguably supports the Court's overwrought and novel description of the" law-abiding phrase); *see also Id.* at 721.

In *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), the Supreme Court ruled local and state laws must comport with the Second Amendment, through its incorporation under the Due Process Clause of the Fourteenth Amendment. In 1868, as in 1791, "the right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified." *Id.* at 777; *see also Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that when state or local government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.") (citation cleaned up). The part of the opinion pertinent to the phrase "law-abiding," emphasized that the Second Amendment ensures "the safety of other law-abiding members of" minority communities. *Id.* at 790. Nothing in *McDonald* cast doubt on the "longstanding regulatory measures" on felons or the mentally ill. *Id.* at 786.

*Bruen* represented a sea change in Second Amendment jurisprudence. The Supreme Court rejected a two-step, tiered scrutiny framework that a panoply of Courts of Appeals had adopted for Second Amendment cases. *Bruen*, 142 S. Ct. at 2127. Although the first step had been "broadly consistent with *Heller*," the second step had subjected an enumerated right to a judge-empowering test, that as a result, systematically ignored *Heller*'s text, history, and tradition framework. *Id.* at 2127, 2129. In its stead, the Supreme Court fashioned a framework that now turns on whether a defendant's conduct is covered by the plain text of the Second Amendment. *Id.* at 2126. If a defendant's conduct is covered, whether then the Constitution "presumptively protects that conduct." *Id.* . The burden then shifts to the government to demonstrate that the challenged "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* There are two forms of historical inquiries: a "distinctly similar" inquiry and a "relevantly similar" inquiry. *Id.* at 2131-32.

A challenged regulation passes constitutional muster under the fairly straightforward historical inquiry when there is a showing of a "general societal problem that has persisted since the 18th century" and a distinctly similar historical regulation dating from the time of the Second Amendment's ratification. *Id.* If, for example, there is a general societal problem, but a lack of a distinctly similar historical regulation, the challenged regulation may be unconstitutional. Other relevant evidence that weighs against the constitutionality of a challenged regulation hinges on whether the societal problem was addressed through "materially different means," or if analogous regulations were proposed but "rejected on constitutional grounds." *Id.*

A similar inquiry applies to "modern regulations that were unimaginable at the founding." *Id. Bruen* instructs federal courts to reason by analogy, with two considerations at the forefront: how and why the challenged regulation burdens a "law-abiding citizen's right to armed self-defense." *Id.* at 2133. In other words, the modern regulation and the 18th century regulation must have imposed "a comparable burden" on an individual's right to self-defense; and the historical analogy between the two regulations must be "comparably justified." *Id.* "To be clear, analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (citation cleaned up).

*Bruen*, however, stressed that "not all history is created equal." *Id.* at 2136. A federal court should first look to the historical period immediately before and after the Second Amendment's ratification. *Id.* English common-law and post-ratification history should be treated with some skepticism, and in the event that such history contradicts the Second Amendment, "the text controls." *Id.* at 2137; *See also Id.* at 2162-63 (J., Barrett concurring) (highlighting that *Bruen* "does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution."). With the historical framework clarified, *Bruen* ruled that the defendants were comfortably

within the ambit of "the people" because they were "two ordinary, law-abiding, adult citizens." *Id.* at 2134. *Bruen*, without much difficulty, also ruled that the defendants' proposed course of conduct was presumptively protected and was unrebutted by the government historical arguments. *Id.* at 2135.

//

//

//

## IV.  The Plain Text of the Second Amendment

> A well regulated Militia, being necessary to the Security of a free State, the right of the people to keep and bear Arms, shall not be infringed.
>
> - U.S. Const. amend. II.

To begin, this Court discounts the prefatory clause from its analysis because neither party has connected the idea of a militia to the underlying historical arguments, and admittedly, there is virtually no concern here regarding the elimination of a militia. Ryno's conduct meets *Heller*'s textual definition of bearing arms because the record indicates that he physically carried firearms, on at least three known occasions, outside the home. *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). This Court can also reasonably conclude that Ryno kept firearms within the meaning of the Second Amendment because Ryno believed he could lawfully possess firearms despite the domestic violence protection order, and again, did so on three known occasions. *Id.* The parties do not dispute that Ryno was keeping and bearing arms.

The real crux is whether Ryno is part of the "people." On this point, this Court declines Ryno's invitation to constrain *Bruen*'s first step to a sole consideration of whether a defendant's conduct—and their conduct only— is presumptively protected. Implicit in *Bruen*'s textual inquiry is a consideration of the amendment's *plain text*. In other words, this Court will reconcile both the *what* and the *whom*; stated more fully, what conduct is being regulated and who can possess and carry firearms. This Court's approach is in accord with *Bruen*'s analytical approach. There the Supreme Court first ruled that the defendants were part of the people before turning to the regulated conduct. *Bruen*, 142 S. Ct. at 2134.

"The people" is admittedly a term of art that was not defined in the Constitution. *Heller*, 554 U.S. at 2791 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It is important to remember, at this juncture, the basic premise that a "word or phrase is presumed to bear the same meaning throughout a text" to avoid "an interpretation that causes it to duplicate another provision or to have no consequence." *See* Antonin Scalia, & Bryan A. Garner, *Reading Law* 167, 170 & 174 (2012); *see also United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at 3 (N.D. Okla. Sept. 21, 2022). The phrase does appear in other parts of the Constitution. Moreover, *Heller* and *Bruen* emphasized that the principles of our Constitution do not change over time and must be faithfully applied as they existed at or around 1791 and 1868. *See Bruen*, 142 S.Ct. at 2132 ("Fortunately, the Founders created a Constitution—and a Second Amendment—intended to endure for ages to come, and consequently to be adapted to the various crises of human affairs.") (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819) (citation cleaned up). This Court, therefore, begins with our Constitution.

The First Amendment provides a useful analytical model. The Assembly and Petition Clause emphasizes that "Congress shall make no law abridging … the right of the people peaceably to assemble, and to petition the [g]overnment for a redress of grievances." U.S. Const. amend. I. Instructive here is that the First Amendment excludes classes of speech, and not the speaker itself. *See Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 338 (5th Cir. 2013) (J. Jones, dissenting) ("Free speech, in the classic sense, is never subject to interest-balancing before it merits constitutional protection. Speech is protected categorically unless it fits within specifically defined classes, *e.g.*, obscenity, fraud, libel, and state secrets, that received no legal protection at the time of ratification of the Bill of Rights."); *see e.g., Bruen*, 142 S.Ct. at 2156 ("We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is now how the First Amendment works when it comes to unpopular speech or the free exercise of religion."). The breadth of this particular clause extends to the national community. *Heller*, 554 U.S. at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265).

Another codified, pre-existing right that incorporates a broad class of persons is the Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; *Heller*, 554 U.S. at 592. A felon, or as here, a violent misdemeanant, no matter how obstreperous they may be, is not categorically deprived of their right to challenge the reasonableness of a government seizure or search. *See Heller*, 554 U.S. at 645. It may be argued that an analogy between the Second and Fourth Amendment does not map efficiently because the

Fourth Amendment may be viewed as a protective right, as opposed to the Second Amendment's granting of an affirmative right. As *McDonald* and *Bruen* instruct, no precise analogy is required. Indeed, Second Amendment jurisprudence has favorably compared the two amendments, and perhaps so because the "right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (collecting cases); *see also Bruen*, 142 S.Ct. at 2126 n.3. Justice Stevens' dissent in *Heller*, 554 U.S. at 644, underscored this very point, emphasizing that the First and Fourth Amendments are "*not* so limited." *See e.g., United States v. Chovan*, 735 F.3d 1127, 1149 (9th Cir. 2013) (J. Bea, concurring); *see also United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at 9 (W.D. Tex. Nov. 10, 2022).

Other provisions in the constitution point to a broad interpretation of "the people." The Ninth and Tenth Amendment refer to a national community. *Heller*, 554 U.S. at 579-80 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). Section 2, Article I of the Constitution vests "the People" with the right to elect political officials; or in other words, the political community. U.S. Const. Art. I, § 8.

The Supreme Court has concluded that the Second Amendment extends to, and is limited by, the members of the political community. *Heller*, 554 U.S. at 580-81. It is constitutionally appropriate for some classes of persons to be outright excluded from the political community and consequently, the Second Amendment's reach. *See Bruen*, 142 S.Ct. at 2161 (J. Kavanaugh concurring) ("Properly interpreted, the Second Amendment

allows a variety of gun regulations."); *see also United States v. Skoien*, 614 F.3d 638, 639-40 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning.") (emphasis original). This Court therefore agrees with the government that *Bruen* did not abrogate or supplant *Heller* and *McDonald*'s list of longstanding prohibitions. It is true that *Heller*'s dicta, reiterated in *McDonald*, has caused some confusion among the lower courts. Indeed, then Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) has leveled a persuasive, historical critique against sweeping felon-in-possession laws. The Third Circuit has also recently vacated a ruling that excluded *all* felons from "the people." *Range v. Att'y Gen. United States*, No. 21-2835, Order on Rehearing En Banc (3rd Cir. 2023). Dispositive here, however, is that the Supreme Court's dicta was endorsed by two separate majorities, the dicta grapples with novel, complex legal issues, and it is "dicta of the strongest sort." *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 Hastings L.J. 1371, 1372 (2009). Justice Kavanaugh's concurrence in *Bruen* likewise restated the longstanding prohibitions on felons possessing firearms. *Bruen*, 142 S.Ct. at 2161 (J. Kavanaugh concurring). This Court is therefore bound by the dicta in *Heller* and *McDonald*.

On that understanding, it is undisputed that felons have traditionally lost their right to vote, serve on juries, and have lost the ability to hold political offices. *See Mai v. United States*, 974 F.3d 1082, 1093 (9th Cir. 2020) (citing 2 William Blackstone, *Commentaries* 377 and *United States v. McCane*, F.3d 573 1037, 1049 (10th Cir. 2009)). Consistent with this prohibition, the Ninth Circuit has reasoned that "the right to bear arms was inextricably

… tied to the concept of a virtuous citizenry that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). It is not clear why Ryno believes that his § 922(g)(9) case is the proper vehicle to overrule *Vongxay*, a § 922(g)(1)-related ruling. This Court reads the virtuous citizen theory to encompass the disarmament of felons and possibly the mentally ill. *See United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010). This Court therefore need not address this argument here because the "virtuous citizenry" theory does not reach Ryno—a misdemeanant who is part of the political community.

In *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013), the Ninth Circuit ruled that "by prohibiting domestic violence misdemeanants from possession, § 922(g)(9) burdens rights protected by the Second Amendment." *See also Duncan v. Bonta*, 19 F.4th 1087, 1142-43 (J., Bumatay dissenting) (*Chovan*'s "step one inquiry often pays lip service to *Heller*: it asks whether the law burdens conduct protected by the Second Amendment, based on a historical understanding of the scope of the Second Amendment right.") (citation cleaned up). *Chovan*'s second step has since been abrogated, but step one is nonetheless "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment text, as informed by history." *Bruen*, 142 S.Ct. at 2127. *Chovan*'s first step can be severed from its second step because both utilized different modes of analysis; and it is with that understanding that this Court concludes that it is still bound by *Chovan*'s step-one reasoning. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

This Court's conclusion that Ryno is part of the "people" is therefore informed by *Chovan*'s explicit ruling. Judge Bea's concurrence in *Chovan* also provides some critical distinctions between misdemeanants and felons: "As we have seen, in the Founding period, felonies historically resulted in disqualification from certain rights, but misdemeanors did not[.]" 735 F.3d at 1144-49.

A problem with this conclusion, as the government has shown, is the "law-abiding" phrase that has consistently appeared in all of the Supreme Court cases. The strongest passage on this point is *Bruen*'s application of its new test: "It is undisputed that petitioners []—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." There are conflicting legal interpretations on this point. *See United States v. Rahimi*, No. 21-11001 2023 WL 1459240, at 3 (5th Cir. 2023). On the one hand, this Court agrees with the government that Ryno is not necessarily "law-abiding" by virtue of being twice-convicted. A pardon, expungement, or a dismissal of the conviction is required to fully remove a conviction. *Mai*, 974 F.3d at 1093 (citing generally 18 U.S.C. § 921(a)(20)(B)). On the other hand, the "law-abiding" phrase seemingly contravenes the Constitution's consistent definition of "the people," as interpreted by *Heller,* and the phrase may bear more relevance under *Bruen*'s second step. *Rahimi*, 2023 WL 1459240 at 4. This Court hastens to add that no system is perfect. All human enterprises, to include the federal judiciary, are at risk of error.

To provide a conclusion to the disparate and competing analytical threads: the "law-abiding" phrase should yield to the codified rights of the Constitution, binding case law,

and history; all of which point to Ryno as part of the political community, and therefore part of "the people."

## V.    This Nation's History and Tradition

### A. Distinctly Similar Regulations

In 1932,[3] Congress enacted a law to control the use of "pistols and other dangerous weapons in the District of Columbia." Act of July 8, 1932, ch. 465, § 14, 47 Stat. 650, 650; *see also Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 390 (3rd Cir. 2016) (J., Fuentes concurring in part and dissenting in part). An offender was subject to prosecution if a "crime of violence" was committed while armed with a dangerous weapon. Act of July 8, 1932, ch. 465, § 14, 47 Stat. 650, 650. Crimes of violence were "[m]urder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping [*sic*], burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery assault with a dangerous weapon." *Id.* In 1938, Congress enacted the Federal Firearms Act ("FFA"), to address the interstate commerce of firearms. *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (citing Federal Firearms Act, Pub.L. 75-785, 52 Stat. 1250, 1251); *see also Chovan*, 735 F.3d at 1137. The FFA's crime of violence definition mirrored the definition from the 1932 Act. *Id.*; *Id.* It was a federal crime for a person, convicted of a crime of violence, to "receive" any firearm or ammunition that was transported across

---

[3] From this Court's independent review, there are approximately fourteen state laws, from 1837 to 1931, that generally touched on or related to firearm regulation. Because it is the government's burden, this Court will discount these state laws altogether. *Bruen*, 142 S.Ct. at 2127 (reasoning that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

state lines. *Skoien*, 614 F.3d at 640-41. The "ban on possession by *all* felons was not enacted until 1961," and notably, Congress there replaced the crime of violence definition with "crime punishable by imprisonment for a term exceeding one year." *Id.* (citing Pub.L. 87-342, 75 Stat. 757); *see also Quiroz*, 2022 WL 4352482 at 4-5; *see also United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900 at 3 (W.D. Tex. 2022). Moreover, the 1968 Act broadened its reach to include the "mentally ill" and habitual drug users. *See Yancey*, 621 F.3d at 683. The purpose of the 1968 Act was to assist law enforcement "in their fight against crime and violence" but cautioned that no restrictions were placed "on law-abiding citizens with respect" to the use and possession of firearms. Pub.L. No. 90-618, § 101, 82 Stat. 1213; *see also Chovan*, 735 F.3d at 1137. In 1996, Congress eventually became aware of a "dangerous loophole" in the 1968 Act that allowed domestic violence misdemeanants to possess firearms. 142 Cong. Rec. S2646–02 (1996) (statement of Sen. Lautenberg); *see also Id.* (statement of Senator Feinstein) (explaining that the Lautenberg Amendment was meant to "close th[e] dangerous loophole" that allowed domestic abusers charged with lesser offenses to escape firearm disqualification under § 922(g)(1)); *Hayes*, 129 S.Ct. at 1082; *Chovan*, 735 F.3d at 1139. Section 922(g)(9), a modern regulation "unimaginable at the founding," was thereby enacted. *Bruen*, 142 S.Ct. at 2133.

Whether 1938 or 1996, the weight of this historical evidence nonetheless indicates that § 922(g)(9) is a creature of the twentieth century. *McCane*, 573 at 1048 (J., Tymkovich concurring). In other words, "it is not clear that such prohibitions are so longstanding." *Chovan*, 735 F.3d at 1137. It is true that there was a longstanding concern to disarm dangerous people, but the inquiry here is whether there are *straightforward* examples from

the founding era regarding domestic violence misdemeanants. A Texas district court recently surveyed the past four centuries for the disarmament of domestic violence misdemeanants, concluding that "glaringly absent from the historical record—from colonial times until 1994—are consistent examples of the government removing firearms from someone accused (or even convicted) of domestic violence." *Perez-Gallan*, 2022 WL 16858516 at 6. This Court agrees. Other courts have undertaken a historical survey and arrived at the same or similar conclusion. *See United States v. Chester*, 628 F.3d 673, 680-81 (4th Cir. 2010) (collecting cases); *see also Skoien*, 614 F.3d at 650-51 (J., Sykes dissenting) ("[S]cholars disagree about the extent to which *felons* -- let alone misdemeanants-were considered excluded from the right to bear arms during the founding era… We simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood.") (emphasis in original). Perhaps most important here is that the government's briefing relies heavily on reasoning by analogy. *See generally* Dkt. 31. For example, the subheadings of the government's briefing are categorized as (B)(1) "Section 922(g)(9): A Brief History," and (B)(2) "Historical Analogues to Section 922(g)(9)." Indeed, the government provides extensive reasoning in Section (B)(2) that analogizes § 922(g)(9) to felon disarmament, those convicted of violent crimes, the disloyal, and minority communities. This Court will therefore turn to the "relevantly similar" inquiry and assess each of the government's analogies in turn.

## B. Relevantly Similar Regulations

In 17th Century England, the royal government disarmed citizens that it deemed to be "dangerous to the Peace of the Kingdom." *Kanter*, 919 F.3d at 456 (quoting Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 1662)); *see also Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alc. Tob. Fir.*, 700 F.3d 185, 200 (2012) (citing *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)); *see also Rahimi*, 2023 WL 1459240 at 7-8. These English traditions greatly influenced early colonial America. Those who also refused to swear an oath of allegiance would be disarmed because they were "deemed likely to disrupt society." despite being "neither criminals nor traitors." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 507-08 (2004); *Nat'l Rifle Ass'n*, 700 F.3d at 200. There is history from the 1770s that demonstrates that some states disarmed citizens that refused to take an oath of allegiance. *Nat'l Rifle Ass'n*, 700 F.3d at 201; *Kanter*, 919 F.3d at 457-58; *Perez-Gallan*, 2022 WL 16858516 at 11. The history of disarming loyalists does not explain how or why § 922(g)(9) can burden Ryno's right to carry and possess firearms for self-defense. *Bruen*, 142 S.Ct. at 2132-33. As *Kanter* aptly points out, any potential danger that loyalists present disappeared once they pledged their allegiance. 919 F.3d at 457-58. As mentioned before, a conviction remains a conviction unless the record is wiped clean. "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practices support a legislative power to categorically disarm felons [or, a fortiori, misdemeanants] because of their status." *Id.* This Court therefore concludes that the loyalist history is not relevantly similar because history

does not impose a comparable burden or a comparable justification to the disarmament of domestic violence misdemeanants. *Bruen*, 142 S.Ct. at 2133.

Neither does this Court find an apt comparison in the government's proffered analog of disarming slaves, freed Blacks, and Native Americans. *Id.* (reasoning that the two regulations must be "comparably justified."). This Court agrees with Ryno that "these racialized disarmament laws [are] far too attenuated" to be employed as historical analogies. Put simply—the government feared armed uprising from minority populations because such populations were stripped of fundamental rights, of their humanity, and perhaps most repugnant, were viewed as *property or fractions of persons*. *See Rahimi*, 2023 WL 1459240 at 8 ("The purpose of these dangerousness laws was the preservation of political and social order, not the protection of an identified person from the specific threat posed by another."). Employing or placing weight on America's sorry history now, to justify the disarmament of domestic violence misdemeanants, runs the risk of subverting our Constitutional governance. On this point, *Bruen* stressed that not all history is or should be regarded as equal. *Id.* at 2136. Pertinent here is that *Bruen*'s framework did not provide a "mechanism to distinguish unjust or unconstitutional traditions, such as the tradition of having race-based arm restrictions, from other traditions." *Duncan v. Bonta*, 19 F.4th 1087, 1125 (9th Cir. 2021) (J. Berzon concurring). This Court will therefore not analogize § 922(g)(9) to the government's proffered history.

The government's historical analogues to violent felons, or generally, "dangerous" persons, are a different story. Take, for example, the favorably cited minority proposal from Pennsylvania. *Heller*, 554 U.S. at 604; *Binderup*, 836 F.3d at 367; *Skoien*, 614 F.3d

at 640. The proposed language is historically relevant: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History*, 663, 665 (1971). Samuel Adams' Amendment in Massachusetts also sheds light on the Second Amendment's understanding at the founding era, proposing that the "Constitution be never construed to authorize Congress to … prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Heller*, 554 U.S. at 604, 658; *Binderup*, 836 F.3d at 367; *Kanter*, 919 F.3d at 454-66 (J., Barrett dissenting) (providing several definitions of peaceable, and relevant among them, "not violent; not bloody; not quarrelsome; not turbulent.") (citation cleaned up). This Court hastens to add that, as a formal approach, Ryno is correct that the ratification language was not enacted. *See Rahimi*, 2023 WL 1459240 at 8 ("But these proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right."). A careful reading of *Bruen* and *Heller*, however, reveals that ratification language is not categorically excluded from analysis. There are shades of a functional approach in *Bruen* and *Heller* that require a broader degree of generality which, in turn, allow weight to be placed on ratification language. This Court, in other words, is employing a dispassionate historical inquiry that a faithful reading of *Bruen* requires as it relates to ratification language. *See Rahimi* 2021 WL 145920 at 9 n.9 and 10 (J. Ho concurring). On this point, this Court agrees with the government that the ratification language is a historical tool that informs, and does not contradict, a codified,

pre-existing right. *See* Dkt. 51 at 6 (citing *Heller*, 554 U.S. at 592). Reasonable minds can differ on this; and reasonable minds can differ on the weight placed as it relates to the regulation at issue. Under these circumstances, and *as-applied* to Ryno, the ratification language is an apt comparison that is consistent with the Second Amendment's jurisprudential backdrop.

These two historical sources, taken together, indicate that founding-era attitudes were concerned with disarming those who had a proclivity towards violence or those that risked injury to the public. *Kanter*, 919 F.3d at 456 (J., Barrett dissenting); *see also Binderup*, 836 F.3d at 368-68 (citing Stephen P. Halbrook, *The Founders' Second Amendment*, 190-215 (2008)) ("surveying the debates at the ratifying conventions and highlighting the commonplace understanding that dangerous persons could be disarmed."); *see also Rahimi*, 2021 WL 1452940 at 10-11 (J. Ho concurring) (reasoning that "our Founders firmly believed in the fundamental role of government in protecting citizens against violence, as well as the individual right to keep and bear arms—and that these two principles are not inconsistent but entirely compatible with one another"). Indeed, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter*, 919 F.3d at 451 (J., Barrett dissenting); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."). The

government's historical analogues to § 922(g)(1) are also relevant. As previously mentioned, felons—particularly violent ones—were punished with "confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life: others induce a disability, of holding offices or employments, being heirs, executors, and the like." *Mai*, 974 F.3d at 1093 (citing 2 William Blackstone, *Commentaries* 377). It bears emphasis that *Vongxay* has explicitly ruled that violent "felons are categorically different from the individuals who have a fundamental right to bear arms." *Id.* (quoting *Vongxay*, 594 F.3d at 1115); *see also Chovan*, 735 F.3d at 1144-45 (citing *McCane*, 573 F.3d at 1049) ("[T]he application of § 922(g) to a violent felon … would appear appropriate under any Second Amendment reading. After all, felons lose out on fundamental rights such as voting and serving on juries[.]").

The government's recitation of the historical treatment of dangerous persons and felons is well-presented and a representative historical analogue. *Bruen*, 142 S.Ct. at 2133; *See Rahimi*, 2023 WL 1452940 at 11 (J. Ho concurring) ("Our laws contemplate the incarceration [and disarmament] of those who criminally threaten, but have not (yet) committed violence. After all, to the victim, such actions are not only life-threatening— they're [*sic*] life-altering."). These historical analogues are comparable to § 922(g)(9) as-applied to Ryno. *Id.* Inherent in § 922(g)(9) is the predicate offense that requires use or attempted use of physical force by an intimate partner, or by a person with whom the victim shares a child. 18 U.S.C. § 921(a)(33). Section 922(g)(9) is particularly pointed to classes of persons that are dangerous enough to be disarmed because the element of physical force, in other words, is power or violence against another's physical safety. Moreover, a brief

review of the facts in the record indicates that Ryno has a propensity to commit violence, and is therefore a danger to the public. This conclusion is further strengthened by the fact that, after being notified that he was prohibited from possessing firearms by virtue of his convictions, Ryno was found "passed out" on a *public* highway, and in possession of more firearms and ammunition. Taken together, this is the very definition of dangerousness as contemplated at the time of the Second Amendment's enactment. Then, as now, the burden on the Second Amendment right to self-defense is comparable because the disarmament of violent or dangerous persons, such as Ryno, ensures the safety of the public, and along with it, its community members, such as Ryno's domestic partners. Taken together, the historical analogues "pass constitutional muster." *Bruen*, 142 S.Ct. at 2133.

All told, the government has demonstrated that § 922(g)(9), as-applied to Ryno, is consistent with this Nation's tradition of firearm regulation, and Ryno therefore falls outside the Second Amendment's "unqualified command." *Id.* at 2126.

## VI.    Conclusion

For the reasons set forth above, Ryno's Motion to Dismiss should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

DATED this 22nd day of February, 2023, at Anchorage, Alaska.

*s/ Matthew M. Scoble*
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on March 8, 2023. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Miranda v. Anchondo, et al., 684 F.3d 844 (9th Cir. 2012). The

Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before the CLOSE OF BUSINESS on March 15, 2023. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a). Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).