IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>JOEL MICHAEL RYNO,<br><br>        Defendant. | Case No. 3:22-cr-00045-JMK<br><br>**ORDER ADOPTING<br>REPORT AND RECOMMENDATION** |

        Before the Court at Docket 30 is Defendant Joel Michael Ryno's Motion to Dismiss. The United States of America (the "Government") responded in opposition at Docket 31. The motion was referred to Chief Magistrate Judge Matthew M. Scoble. At Docket 49, Judge Scoble issued his Final Report and Recommendation, in which he recommended that the motion be denied. In light of the Fifth Circuit's decision in *Rahimi v. United States*,[1] at Docket 50, Judge Scoble withdrew his Final Report and Recommendation and ordered supplemental briefing. The Government and Mr. Ryno provided their supplemental briefing at Dockets 51 and 53, respectively. At Docket 54, Judge Scoble issued his Final Report and Recommendation, in which he again

---

[1] 61 F.4th 443 (5th Cir. 2023).

recommended that the motion be denied. Mr. Ryno objected to the Final Report and Recommendation at Docket 55.

The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1). That statute provides that a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[2] A court is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."[3] But as to those topics on which no objections are filed, "[n]either the Constitution nor [28 U.S.C. § 636(b)(1)] requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct."[4]

Before turning to Defendant's objection, the Court recognizes the unique historical analysis now required by the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[5] Without a determinative test, federal district courts must evaluate and compare developments in American legal history to the modern regulation. The Court thanks the parties for their thoughtful and well-researched briefing on the issues posed here, as well as Judge Scoble for his well-considered recommendations. Additionally, the Court gives special thanks to its local Circuit Librarian for her assistance in locating many of the historical primary sources cited in this order and required for this

---

[2] 28 U.S.C. § 636(b)(1)(C).
[3] *Id.*
[4] *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.").
[5] 142 S. Ct. 2111 (2022).

*United States v. Ryno*  Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation  Page 2
Case 3:22-cr-00045-JMK-MMS   Document 58   Filed 05/31/23   Page 2 of 14

review. Amidst a quickly evolving and changing area of law, these cumulative efforts have greatly assisted the Court.

I. **Defendant's Objection**

Title 18 United States Code section 922(g)(9) strips an individual "convicted in any court of a misdemeanor crime of domestic violence" of their Second Amendment right to bear arms. In passing this statute in 1996, Congress intended to ensure that individuals convicted of domestic violence crimes would be unable to possess firearms.[6] The legislative history reflects an intent to reduce intimate partner homicides and firearm related violence;[7] and therefore, classifies domestic violence misdemeanants as a class of individuals, unable to responsibly maintain their Second Amendment rights.[8] Section 922(g)(9) is a gender neutral regulation, but the legislative history reflects lawmakers' intent to address disproportionate effect of domestic violence on women.[9] The Court takes judicial notice of this disproportionate effect as well as the reported overall decline in intimate partner violence crimes from 1993 to 2010.[10]

---

[6] 142 Cong. Rec. S2646-02 (1996) (statement of Sen. Feinstein) (explaining that the Amendment was meant to "close the dangerous loophole" that allowed domestic violence misdemeanants to escape firearm disqualification under § 922(g)(1)).

[7] 142 Cong. Rec. S11872-01 (1996) (statement of Sen. Lautenberg) (explaining that the Amendment was designed to "save the life of the ordinary American woman" by ensuring that an abusive misdemeanant partner would not have access to firearms).

[8] 18 U.S.C. § 922(g)(9).

[9] *Supra* notes 7 & 8.

[10] *See generally* SHANNON CATALANO, PH.D., U.S. DEP'T. OF JUST., BUREAU OF STAT., INTIMATE PARTNER VIOLENCE, 1993–2010 (rev. Sept. 29, 2015). The Court will use the term domestic violence throughout this order for consistency with Section 922(g)(9) but recognizes the current, more accurate term is intimate partner violence.

*United States v. Ryno*     Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation     Page 3
Case 3:22-cr-00045-JMK-MMS    Document 58    Filed 05/31/23    Page 3 of 14

The Second Amendment to United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *Bruen* analysis "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[11] From that framework, historical analogies must be presented, tested, and evaluated as "relevantly similar."[12] When analyzing the relevant similarity of regulations, courts at minimum must assess "how and why the [the modern and historical] regulations burden a law-abiding citizen's right to armed self-defense."[13] The Government need only show a "well-established and representative historical *analogue*, not a historical *twin*."[14]

*Bruen* guides that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[15] Although the meaning of the Second Amendment is fixed "according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."[16] "[T]he right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms."[17]

---

[11] *Bruen*, 142 S. Ct. at 2131.
[12] *Id.* at 2131–33.
[13] *Id.* at 2133.
[14] *Id.* (emphasis in the original).
[15] *Id.* at 2132.
[16] *Id.*
[17] *Id.* at 2138.

*United States v. Ryno* Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation Page 4
Case 3:22-cr-00045-JMK-MMS   Document 58   Filed 05/31/23   Page 4 of 14

Defendant objects to the constitutionality of § 922(g)(9) in an as-applied challenge, arguing that the Government failed to offer examples of historical firearm regulations that are "distinctly similar" to 18 U.S.C. § 922(g)(9).[18] However, *Bruen* does not require the Government to identify a "distinctly similar" historical firearm regulation.[19] Rather, a "distinctly similar" historical regulation is "relevant evidence" for a court to consider in its overarching analysis.[20] Defendant's objection overstates the Government's burden.

In analyzing whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," the Court must consider the relevant legal frameworks in place at the time the Amendment was ratified.[21] Here, the lack of a distinctly similar firearm regulation stems from two American historical roots: (1) the societal norms accepting domestic violence; and (2) the limited legal frameworks for addressing domestic violence.

To begin, the Court must first address the past societal convention and common law doctrine of coverture. Under coverture, once a woman married, her legal rights and obligations were subsumed by her husband.[22] As a *feme covert,* she no longer existed as her own entity, but as a dependent to the adult male head of household.[23] From

---

[18] *See* Docket 55 at 2–3.
[19] *Bruen*, 142 S. Ct. at 2131–33.
[20] *Id*. at 2131.
[21] *Id.*
[22] *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *432, *441–44.
[23] Manby v. Scott (1659) 83 Eng. Rep. 268, 1 Mod. 124, 130 (reasoning "[t]he husband is the head of the wife as fully as the King is the head of the commonwealth; and the wife by law is put *sub potestate viri* and under his protection, although he hath not *potestatem vitae et necis* over her, the King hath over his subjects.").

the English common law well into the modern era, coverture remained a stricture on most American women's rights and lives.[24]

Domestic violence has been a long-recognized occurrence, but women had few legal protections against it until the modern era.[25] The English common law addressed domestic violence as a breach of the King's peace, a crime against the community and crown.[26] However, there were limited remedies for a such claims; courts could only attempt to negate future harm through surety and public scrutiny.[27] Adopting and adapting the English common law, the American Colonies also largely addressed violence and marital discord through common law breach of peace claims, with surety as a remedy.[28]

---

[24] *Id.*; 1 WILLIAM BLACKSTONE, COMMENTARIES *432, *445 (summarizing the legal effects of coverture and claiming "that even the disabilities which the wife lies under are for the most part intended for her protection and benefit"); *United States v. Yazell*, 382 U.S. 341, 351–58 (1966) (calling "[t]he institution of coverture peculiar and obsolete," then acknowledging that eleven states continued to have codified coverture laws in place and upholding the contract limitations of the Texas law of coverture).

[25] *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *432, *444–45 (discussing the "old" common law permitting a husband to give "moderate correction" to his wife similar to that of a servant or child, but prohibiting "violence." The Court notes that the standard for violence in England in 1765 is likely vastly different than modern American society.).

[26] 1 WILLIAM BLACKSTONE, COMMENTARIES *432, *445 (commenting that "in the politer reign of Charles the Second, this power of correction began to be doubted; and a wife may now have security of the peace against her husband; or in return a husband against his wife."); Justices of the Peace Act 1361, 34 Edw. 3, c.1 (Eng.) (creating justices of the peace with the power to "to the Intent that the People be not by such Rioters or Rebels troubled nor endamaged, nor the Peace be blemished[.]".

[27] *E.g.*, Manby v. Scott (1659) 83 Eng. Rep. 268, 1 Mod. 124, 131 (recognizing the breach of peace claim for a wife "in fear or in doubt of her husband that he will beat or kill her, she shall have *supplicavit* out of the Chancery against her husband, and cause him to find sureties that the will not beat or kill her, and for to order and rule her, &c."); The King v. Lord Lee (1675) 83 Eng. Rep. 128 (binding Lord Lee with sureties for good behavior in response to the wife's claims of being "in danger of her life by him," but declaring "they could do no more than bind him, and that they could not remove her from him.").

[28] *See* WILLIAM EDWARD NELSON, THE COMMON LAW IN COLONIAL AMERICA, VOL. II, THE MIDDLE COLONIES AND THE CAROLINAS, 1660–1730 34–35 (2013).

Colonies, in now the modern states of Massachusetts, Rhode Island, and New Hampshire, enacted laws against wife beating,[29] but the codified laws resulted in few prosecutions.[30]

The American Revolution offered a brief hope to restructure a woman's place in a new American society. As Abigail Adams implored to John Adams:

> in the new Code of Laws which I suppose it will be necessary for you to make I desire you would Remember the Ladies, and be more generous and favorable to them than your ancestors. Do not put such unlimited power into the hands of the Husbands. Remember all Men would be tyrants if they could.[31]

However, her entreaty to "put it out of the power of the vicious and the Lawless to use us with cruelty and impunity" did not come to pass.[32] American women remained excluded from political participation, their legal rights subsumed by their husbands.[33]

After the Revolution, the States continued to adjudicate the threat of domestic violence as a common law breach of the peace claim using surety as the remedy.[34]

---

[29] Ruth H. Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy*, 5 EARLY AM. STUDIES: AN INTERDISC. J., 223, 232; Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640–1980*, 11 CRIME & JUST. 19, 22–26 (1989).

[30] JOHN GILBERT MCCURDY, *Gender and Violence in Early America, Volume III 1500–1800 CE*, THE CAMBRIDGE WORLD HISTORY OF VIOLENCE 260 (Robert Antony, et al. eds., 2020). Mr. McCurdy also reports that colonial and early American Pennsylvania courts heard spousal assault and battery claims in much greater volume but does not elaborate as to the source of these claims.

[31] Letter from Abigail Adams to John Adams (March 31, 1776) (in ADAMS FAMILY PAPERS, MASSACHUSETTS HISTORICAL SOCIETY).

[32] *Id.*

[33] The Court notes that many living in America lacked citizenship or the constitutional rights constructed by the Founders due to racial or economic exclusions.

[34] *E.g.*, William Waller Hening, The New Virginia Justice, Comprising the Office and Authority of a Justice of the Peace, in the Commonwealth of Virginia, together with a variety of useful precedents adapted to the laws now in force 573 (2nd ed. 1810) (articulating that a wife or child's "apprehension of present or future danger" due to threats of by a husband or father may merit a surety of the peace, but not for past battery); *Morris v. Palmer*, 107 N.H. 123, 123–129

*United States v. Ryno*  Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation  Page 7
Case 3:22-cr-00045-JMK-MMS   Document 58   Filed 05/31/23   Page 7 of 14

However many courts viewed violence occurring within a family unit as a private matter unsuitable for public scrutiny.[35] The 1824 Mississippi Supreme Court resoundingly held that "whether a husband can commit an assault and battery upon the body of his wife" should not be adjudicated by courts, dismissing the violence as mere "Family Broils and dissentions."[36] With similar reasoning, North Carolina Supreme Court refused to adjudicate domestic violence as assault and battery, so that it would "not inflict upon society the greater evil of raising the curtain upon domestic privacy, to punish the lesser evil of trifling violence."[37] Some courts expressly endorsed a husband's legal right to use physical violence.[38] Other courts excluded wives and children as entire classes of victims for assault and battery.[39] Even when a wife, separated from her husband, was able to

---

(N.H. 1859) (holding that a wife suing for breach of peace may recover costs and attorney's fees from husband); *see also Codd v. Codd*, 32 Johns. Ch. 141, 141–43 (N.Y. Chan. 1816) (declining to impose a surety to keep the peace on a previously violent husband and father but granting custody and care of the children exclusively to the wife and mother).

[35] E.g., *State v. Rhodes*, 61 N.C. 453, 456–57 (N.C. 1868) (reasoning "that family government is recognized by law as being complete in itself as State government in itself . . . we will not interfere with or attempt to control it . . . . For, however great are the evils of ill temper, quarrels, and even personal conflicts inflicting only temporary pain, they are not comparable with the evils which would result from raising the curtain, and exposing to public curiosity and criticism, the nursery and the bed chamber.").

[36] *Bradley v. State*, 1 Miss. 156, 157–58 (Miss. 1824) (holding "Family Broils and dissentions cannot be investigated before the tribunals of the country, without casting shade over the character of those who are unfortunately engaged in the controversy. To screen from public reproach those who may be thus unhappily situated, let the husband be permitted to exercise the right of moderate chastisement, in cases of great emergency, and use salutary restraints in every case of misbehavior, without being subjected to vexatious persecutions, resulting in the mutual discredit and shame of all parties concerned.").

[37] *State v. Rhodes*, 61 N.C. 453, 456–60 (N.C. 1868).

[38] *State v. Black*, 1 Win. 266, 267, 60 N.C. 262 (N.C. 1864) (holding "[a] husband is responsible for the acts of his wife, and he is required to govern his household, and for that purpose the law permits him to use towards his wife such a degree of force as is necessary to control an unruly temper and behave herself[.]"; see also Emily J. Sack, *Battered Women and the State: The Struggle for the Future of Domestic Violence Policy*, 2004 WIS. L. REV. 1657, 1661 (2004).

[39] E.g., *State v. Hussey*, 44 N.C. 123, 126 (N.C. 1852) (reasoning "that a slap on the check,

procure an indictment for assault and battery, as in *State v. Black*, the case was roundly rejected on the grounds that:

> unless some permanent injury be inflicted, or there be an excess of violence, or such a degree of cruelty as shows that it is inflicted to gratify his own bad passions, the law will not invade the domestic forum or go behind the curtain. It prefers the parties to themselves, as the best mode of inducing them to make the matter up and live together as man and wife.[40]

Thankfully, society changed.[41] States began to criminalize "wife beating."[42] Women gained the right to vote.[43] The doctrine of coverture faded away.[44] States

---

let it be as light as it may, indeed any touching of the person of another in a rude or angry manner—is in law an assault and battery. In the nature of things it cannot apply to persons in the marriage state, it would break down the great principle of mutual confidence and dependence; throw open the bedroom to the gaze of the public, where peace and concord ought to reign.").

[40] *State v. Black*, 1 Win. 266, 267, 60 N.C. 262 (N.C. 1864) (reversing a jury verdict convicting a husband of assault and battery where during the course of a verbal argument he grabbed the wife by the hair, pulled her to floor, and held her on the ground injuring her head and throat).

[41] See Reva B. Siegel, "*The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117 (1996) (discussing societal movement away from legally acceptable "wife chastisement," the development of gender-neutral domestic violence laws, and the drafting of the Violence Against Women Act).

[42] *E.g.*, An Act to Protect Married Women, ch. 109, 1850 Tenn. Pub. Acts 301; An Act to Inflict Corporal Punishment Upon Persons Found Guilty of Wife-beating, ch. 120, 1882 Md. Laws 172; An Providing for the Corporal Punishment of Wife-Beaters, ch. 204 Del. Laws 493; An Act to amend Section 1772, ch. 203, sec. 1 § 1772, 1905 Or. Laws 335–36 (amending the assault and battery statute to provide that "any person who shall commit an assault and battery upon or beat his wife, shall in the discretion of the court before which is had, be sentenced to be whipped not exceeding twenty lashes, or by imprisonment or fine as above provided."; *see also Elizabeth Pleck, Criminal Approaches to Family Violence, 1640–1980*, 11 CRIME & JUST. 19, 35–44 (1989) (discussing the Temperance Movement and a national wide "volcano of moral outrage at domestic abuse" from 1875–90 resulting in punitive legislative proposals and criminal laws.).

[43] U.S. CONST. amend. XIX.

[44] *Yazell*, 382 U.S. at 361 (Black, J., dissenting addressing that the American adoption and codification of coverture "rests on the old common-law fiction that the husband and wife are one. This rule has worked out in reality to mean that though the husband and wife are one, the one is the husband. This fiction rested on what I had supposed is today a completely discredited notion that a married woman, being a female, is without capacity to make her own contracts and do her own business. I say 'discredited' reflecting on the vast number of women in the United States

criminalized acts of domestic violence in gender neutral terms and outside the bounds of marriage.[45] No longer in the shadows of the home, domestic violence gained national attention and federal legislative support.[46]

*Bruen* instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[47] American legal history and tradition indicates that lawmakers, both at the time of ratification and well into the 20th century, simply did not recognize domestic violence as a societal problem meriting criminal liability. Section 922(g)(9) cannot be considered to be a "regulation address[ing] a general societal problem that has persisted since the 18th century" because, unfortunately, only in recent decades has domestic violence become codified as a crime against a person and recognized as societal problem rather than a private matter.

---

engaging in the professions of law, medicine, teaching, and so forth, as well as those engaged in plain old business ventures as Mrs. Yazell was.").

[45] *See e.g.*, ALASKA STAT. § 18.66.990 (defining acts of domestic violence as part of criminal offenses, enacted in 2003 and amended in various legislative sessions); MONT. CODE ANN. § 45-5-206 (2021) (criminalizing partner or family member assault, originally enacted in 1985 and amended in various legislative sessions); ARIZ. REV. STAT. ANN. § 13-3601, *et seq.* (addressing various acts of domestic violence as "family offenses," originally enacted in 1980 and amended in various legislative sessions); *see also* Cheryl Hanna, *No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions*, 109 HARV. L.R. 1849, 1857 (1996) (noting that all states outlawed wife beating by 1920, but only since the 1980s has the criminal justice system began addressing domestic violence as a serious violent crime).

[46] *E.g.*, The Violence Against Women Act, Pub. L. 103-322, 108 Stat. 1796.

[47] *Bruen*, 142 S. Ct. at 2131.

## II. Judge Scoble's Analysis

Section 922(g)(9) must be evaluated with a "more nuanced approach," due to the unprecedented societal concern of domestic violence and dramatic technological changes in firearms since the Founding.[48] *Bruen* calls on courts to address the "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[49] Individuals convicted of crimes are, by definition, not law-abiding.[50] As applied here, the State of Alaska adjudicated Mr. Ryno twice for violating Alaska's assault and domestic violence assault statutes.[51] In accordance with federalism and comity, the federal district court must recognize these state court convictions.[52]

In evaluating historical analogues as to whether other non-law-abiding citizens, such as domestic violence misdemeanants like Mr. Ryno, have been divested of their right to bear arms, Judge Scoble relies on proposed language from state ratification

---

[48] *Id.* at 2132; *supra* notes 6 & 7; *see generally D.C. v. Heller*, 554 U.S. 570, 711–12 (2008) (Breyer, J., dissenting and discussing the reported prevalence of handguns and domestic violence).

[49] *Bruen*, 142 S. Ct. at 2133.

[50] *Cf. United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (discussing plausible overuse of minor, non-violent criminal convictions as a justification to infringe on the Second Amendment rights of individuals. The Court does not extend this statement beyond the context of this specific analysis.).

[51] *State of Alaska v. Joel Michael Ryno*, Case No. 3PA-17-01151CR (judged guilty of misdemeanor assault per ALASKA STAT. § 11.41.230(a)(1) after entering guilty plea on April 19, 2019). *State of Alaska v. Joel Michael*, Case No. 19-02536CR (judged guilty of misdemeanor assault per ALASKA STAT. § 11.41.230(a)(1) after entering guilty plea on June 15, 2021). The Court also notes Case No. 3PA-15-01330CR (judged guilty of misdemeanor assault per ALASKA STAT. § 11.41.230(a)(3) after entering guilty plea on December 7, 2015, which state court records indicates was also related to domestic violence.

[52] *See Rahimi* at 458–59 (distinguishing Section 922(g)(8) as predicated on a civil adjudication, rather than a criminal conviction); *see also Rahimi* at 455 n.7 (noting "[t]he distinction between a criminal and civil proceeding is important because criminal proceedings have afforded the accused substantial protections throughout our Nation's history. In crafting the Bill of Rights, the Founders were plainly attuned to the preservation of these protections.").

conventions which would have allowed the disarming of criminals or those who posed a risk of danger to others.[53] While this proposed language was not enacted, Judge Scoble nevertheless found it informative.[54] The Court agrees.[55] Judge Scoble further relies on "the historical treatment of dangerous persons and felons" as a broad representative analogue of legislative power to disarm individuals. The Court also agrees. The Court finds these analogues to be the most consistent with the controlling Second Amendment jurisprudence.[56]

Additionally, the Court finds the historical use of surety for preventative firearm misuse informative.[57] From England to the Colonies and carried on in the States, courts used surety to prevent violence and ensure a stable civil society.[58] At the time of Founding and into the Nineteenth century, justices of the peace and common law courts used breach of the peace claims and surety to address individuals at cognizable risk of

---

[53] Docket 54 at 24–27.
[54] *Id.* at 25.
[55] *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3rd Cir. 2021) (When seeking to ensure that we do not "endors[e] outliers that our ancestors would never have accepted," looking to unenacted proposals is not forbidden.).
[56] *Bruen*, 142 S. Ct. at 2133; *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 786 (2010) (stating that the holding in Heller, "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626–27)).
[57] E.g., *Com. v. Miller*, 452 Pa. 35 (Pa. 1973) (affirming the hearing process, surety bond, and order to keep the peace for one year imposed on a husband who brandished a handgun and made repeated threats to commit suicide and murder his wife).
[58] Brief of Professors Robert Leider and Nelson Lund, and the Buckeye Firearms Assoc. at Amici Curiae in Support of Petitioners, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (No. 20-843) at 23.

misusing their firearms.[59] As the Nineteenth century progressed, states and territories codified surety laws.[60] As the Ninth Circuit previously noted, "[t]he English practice of surety of the peace, which carried over to the states, was a substantive restraint on anyone who was the subject of a complaint" and "a means of keeping the peace in areas lacking a centralized police force."[61] The Court agrees that surety laws, though a financial restriction, is historical evidence of codified, substantive infringements on Second Amendment rights.[62]

## III. Conclusion

Section 922(g)(9) is a heavy burden and an exceptional circumstance under the Second Amendment. The Nation's legal history in addressing domestic violence demonstrates clear evidence to overrule Defendant's objection. The Court finds sufficient

---

[59] *See E.g.*, SAMUEL FREEMAN, ESQ., THE MASSACHUSETTS JUSTICE: BEING A COLLECTION OF THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, RELATIVE TO THE POWER AND DUTY OF JUSTICES OF THE PEACE 147 (1795); JEREMIAH PERLEY, THE MAINE JUSTICE: CONTAINING THE LAWS RELATIVE TO THE POWERS AND DUTIES OF JUSTICES OF THE PEACE, WITH NECESSARY FORMS 272 (1823).

[60] Mass. Rev. Stat., ch. 13, § 16 (1836); 1838 Terr. of Wis. Stat. § 16, p. 381; Me. Rev. Stat., ch. 169, § 16 (1840); Mich. Rev. Stat., ch. 162, § 16 (1846); 1847 Va. Acts ch. 14, § 16; Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851); 1854 Ore. Stat. ch. 16, § 17, p. 220; D. C. Rev. Code ch. 141, § 16 (1857); 1860 Pa. Laws p. 432, § 6; W. Va. Code, ch. 153, § 8 (1868).

[61] *Young v. Hawaii*, 992 F.3d 765, 820 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1108, 142 S. Ct. 2895 (2022), and *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022). The Court finds these dicta especially persuasive in this as-applied challenge. In 2019, Attorney General William P. Barr declared a law enforcement emergency in rural Alaska under the Emergency Federal Law Enforcement Assistance Program. U.S. DEP'T. JUST., ATTORNEY GENERAL WILLIAM P. BARR ANNOUNCES EMERGENCY FUNDING TO ADDRESS PUBLIC SAFETY CRISIS IN RURAL ALASKA (June 28, 2019), archived at https://perma.cc/JC27-HW6F.

[62] The Court recognizes that the role and weight of surety laws is debated amongst scholars and members of the United States Supreme Court. *Compare Bruen*, 142 S. Ct. at 2148–51 *with Id.* at 2187–88 (Breyer, J., dissenting); *also compare* Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328–1928*, 55 U.C. DAVIS L. REV. 2545 (2022) *with supra note* 57 at 19–33.

*United States v. Ryno*     Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation     Page 13
Case 3:22-cr-00045-JMK-MMS    Document 58    Filed 05/31/23    Page 13 of 14

historical guidance and analogues for the constitutionality of 18 U.S.C. § 922(g)(9). Accordingly, the Court adopts the Final Report and Recommendation, and IT IS ORDERED that the Motion to Dismiss is DENIED.

IT IS SO ORDERED this 30th day of May, 2023, at Anchorage, Alaska.

*/s/ Joshua M. Kindred*
JOSHUA M. KINDRED
United States District Judge

*United States v. Ryno*        Case No. 3:22-cr-00045-JMK
Order Adopting Report and Recommendation        Page 14
Case 3:22-cr-00045-JMK-MMS   Document 58   Filed 05/31/23   Page 14 of 14